**Charles JACKSON, Jr., Plaintiff,**

v.

**The Honorable Robert S. BERGLAND, Defendant.**

**Civ. A. No. 74–1528.**

United States District Court, District of Columbia.

March 30, 1978.

James A. Nelson, Arlington, Va., for plaintiff.

Eric B. Carriker, Sp. Asst. U. S. Atty., Washington, D. C., for defendant.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

In this proceeding, the federal government is charged with discrimination in employment because of race and relief is sought under Title VII of the Civil Rights Act of 1964, *as amended by* 42 U.S.C. § 2000e, *et seq.* Plaintiff, Charles Jackson, Jr., seeks declaratory and equitable relief against the Secretary of Agriculture, alleging discrimination in connection with his employment as a technician in the Agricultural Research Service (ARS) of the United States Department of Agriculture (Department). He charges that he was the subject of racial discrimination beginning in mid-1972 and continuing through 1976–77, when was denied promotion opportunities, and later was the victim of retaliation, when he asserted his Title VII rights.

The matter was tried without a jury. Counsel for the parties were exhaustive and thorough in their presentations. The Court has had ample opportunity to assess the credibility of the many witnesses, to review the administrative record, the numerous exhibits and to consider the arguments and post-trial submissions of counsel.

The Court concludes that the plaintiff has more than carried the burden of proof and has clearly established that he was the subject of racial discrimination. He, therefore, is entitled to appropriate relief. In accordance with Rule 52, Fed.R.Civ.P., the Court enters the following findings of fact and conclusions of law.

### FACTUAL FINDINGS

#### I

Charles Jackson, Jr. is a black citizen of the United States. For the last 20 years he has been employed continuously by the Department of Agriculture. His present classification is a GS–9, Biological Laboratory Technician, assigned to the Agricultural Research Service, Beltsville, Maryland.

He received a Bachelor of Science Degree in 1955 from Alabama A & M College with a major in agronomy and a minor in chemistry. Within two years of his graduation he secured employment with the Department. Despite his college training and degree, his entry classification was a GS–2, agricultural aide. His advancement was unremarkable. Between 1957 and 1964 he was promoted through successive grade levels and by mid-1964 he had obtained his present GS–9 grade level.

In the several succeeding years, Jackson's efforts to secure further promotion were unrewarded. On occasions his supervisors extended various promises, but to his disappointment, these were not fulfilled. Finally, on November 15, 1973, he filed a formal complaint of racial discrimination in employment against the Department. Shortly thereafter, on May 2, 1974, he filed a second formal complaint alleging interference, coercion and reprisal arising from his original complaint.

## II

For the 20 year period of his employment, plaintiff worked primarily in a research unit dealing with ruminant animals. Until mid-1973, he was assigned positions of increasing responsibility and had reasonable expectations of a promotion to a GS–11 level. At various times throughout this period he was independently engaged in research on nutrition and agricultural chemicals and their related biochemistry, physiology and pathology in sheep. While so engaged, he was responsible for designing experiments, experimental management, including the maintenance of experimental records, collecting them into permanent form, summarizing and interpreting the data, and preparing manuscripts for publication. He performed a variety of chemical analyses and supervised a limited number of animal caretakers and technicians as assigned. In turn he was supervised by a higher grade research scientist.

The quality and level of Jackson's performance was recognized in 1970 when a request for his promotion to a GS–11 research technician position was submitted. An audit of his then work assignment by personnel indicated, however, that his position was appropriately classified at the Grade–9 level. The audit report also documented the requirements for his classification as a GS–11.

Following the position classifier's report, plaintiff's immediate supervisors, Mr. Ivan Lindahl and Dr. Paul Reynolds, adjusted and realigned his duties, giving him increased responsibilities and a variety of experiences to support an anticipated second request for his promotion. The credible and undisputed testimony shows that the plaintiff continued in research activities, which were largely independent; that he published papers in professional journals as senior author and as co-author; that on at least one occasion he presented a paper on behalf of the Department at a scientific meeting; and, otherwise enjoyed the encouragement and support of his supervisors and peers.

A second request for Jackson's promotion to a GS–11 research technician was processed in April, 1972. The data required by the Personnel Office to support the request were prepared and submitted by Lindahl and Reynolds, with input from the plaintiff. The position description submitted in Jackson's behalf included a description of his research assignment, supervision received, supervisory and team leadership, and his research accomplishments. Until July, 1972, Lindahl had been Jackson's supervisor. He had first-hand knowledge of his development, work assignments and capabilities. He testified in substance that plaintiff was performing beyond a GS–9 level. While he readily admitted that he was not a personnel classifier, he gave a fair and objective opinion that Jackson was certainly deserving of a GS–11 classification.

Plaintiff's promotion request was caught in a freeze on personnel actions brought about by a pending reorganization. As a result, in July 1972 it was stayed and returned without action along with at least two other promotion requests. However,

two of the returned requests, that of a white male and a white female, were resubmitted on August 16, 1972 and received favorable action. Dr. Robert Oltjen, a key supervisory official of ARS at that time, testified that he knew personally the two employees, that they had worked under him before the reorganization, and that he had first-hand knowledge of them because of his position. They were promoted within several months of resubmission and the government presented no testimony and made no proffer to justify the priority and favorable treatment given them. Jackson's promotion request, however, was held and delayed for at least six weeks beyond that of the two white employees before any action was initiated. The record is clear and the reasonable inference to be drawn is that the white employees were the immediate beneficiaries of their earlier personal contact with Oltgen.

On September 25, 1972, plaintiff's supervisors certified a second request for personnel action as a research technician. The new request failed to include the necessary supporting data. Indeed, the required information was not forwarded through channels until weeks later. The Administrative Record contains Oltjen's statement to the effect that he had instructions from Personnel to delay resubmitting the promotion requests but that they were not delayed any longer than the regulations permitted. This fails to explain, however, why plaintiff's promotion request trailed those of the white employees by more than one month, nor is it clear why plaintiff's supporting documentation was delayed in the first instance.

Jackson's promotion request was ranked with a "moderate to low priority" and was the only one to contain any type of ranking. Shortly after reorganization, matters were uncertain and many personnel actions were held up because of the freeze. While guidelines and instructions were developed at the higher levels of the Agricultural Research Service, Oltjen testified that he was not certain if he ever received written instructions. Priorities were to be established for handling promotion requests and he was asked to rank the personnel in his Laboratory for promotion. He testified at trial that the medium to low priority assigned to plaintiff's promotion request had nothing to do with merit but only with timing, that everything would move along. However, in a deposition on October 26, 1976, he responded:

> Q. Would the "moderate to low" mean that it was a priority of timing, rather than a priority of merit?
>
> A. I don't recall any feelings one way or another four years ago.

On the same subject Dr. C. Edith Weir, Assistant Research Area Director, testified at the trial that the Agricultural Research Service was assigning its own priorities to promotion requests based on length of time since promotion had been recommended, individual accomplishments and length of time since last promotion.

Taken together, it is clear that no definitive and objective criteria were being applied to promotion requests at the various levels of ARS, that Jackson's promotion effort was treated with indifference and at times in a most cavalier manner by the persons responsible. Also, serious questions are presented as to the credibility of Dr. Oltjen who played an important role at this time.

In early 1973, a personnel action involving another ARS employee is also of interest and presents unanswered questions when compared with Jackson's unrewarded efforts. On December 14, 1972, a temporary freeze on promotions was announced for the entire Department. The freeze continued through January 30, 1973. On January 7, 1973, however, a white employee in ARS was promoted as a laboratory technician to a GS-5 grade level. The Department never explained how this was accomplished and whether or not unusual circumstances warranted this exception.

After waiting several months without obtaining any information on the status of the second promotion request, plaintiff requested a personnel audit of his position. The request was made in December, 1972. The

audit which was performed on February 7, 1973, was perfunctory and lasted no more than 10–15 minutes. The information sought by the reviewers related principally to the plaintiff's duties and responsibilities on *that particular day.* There is little, if any, evidence in the record to show that the auditors applied appropriately the classification factors and standards for evaluating a technician or a research position. On February 27 the position classifier recommended that an Evaluation Committee, appointed by the Research Area Director, review plaintiff's current position to determine whether it was research professional or technical in nature, and if professional, the correct grade level. The necessary material required of plaintiff was promptly prepared and he transmitted it through his supervisor, Paul Reynolds, for forwarding through supervisory channels to the Area Director.

Dr. Reynolds, however, held the material and failed to forward it as expected. He testified at trial that Jackson had "overstated" his part in the projects when the material was prepared, and that he (Dr. Reynolds) did not want to "bite the bullet." The Court notes, however, that this "overstated" material tracks and encompasses in large measure, material prepared or endorsed by Reynolds in support of a promotion, only a few months earlier in April and September 1972. Indeed, a portion of it was first incorporated in Jackson's proposed GS–11 position description approved by Reynolds in 1970.

In an affidavit of January 22, 1974, Reynolds gave as his reason for not forwarding the plaintiff's submissions to the Evaluation Committee: "I regarded the supporting material as no longer relevant to the disposition of his promotion request. . . . " The inconsistency in this supervisor's testimony was never satisfactorily explained by the government.

The advance copy of applicable regulations specified that the Assistant Research Area Director was to serve as Chairman of the Evaluation Committee. Accordingly, on March 24, 1973, plaintiff wrote the Assistant Research Area Director, Dr. Weir, advising he was sending the material for the Evaluation Committee to review. While she received plaintiff's letter within a few days, she failed to acknowledge or to respond to him directly until August 1973, some four months later. Her testimony was that she was never involved with the Area Evaluation Committee; that the material should have been sent to the Regional Evaluation Committee; and that the reason she did not so advise the plaintiff was that plaintiff's supervisors would know where to send the material. However, the position classifier testified that the material should have been sent to the Area Evaluation Committee, and that this Committee would in turn forward the material to the Regional Evaluation Committee. Meanwhile, plaintiff's position was never evaluated.

Dr. Weir did refer Jackson's March 24 letter to personnel and in mid-April the Regional Classification Officer advised him that his position description was inaccurate and that he should be reclassified from Agricultural Research Technician GS–9 to Biological Laboratory Technician GS–9. At the same time Reynolds was directed to prepare a position description of the plaintiff's current work assignment. Immediately thereafter, on April 27, plaintiff noted a position appeal to the U.S. Civil Service Commission.

On May 18, 1973, Reynolds and the Personnel Officer for the Northeast Region of ARS, approved and submitted to Civil Service a revised position description of plaintiff as a Biological Laboratory Technician. The document was prepared solely by Reynolds. The plaintiff claims, however, that the revised description did not fairly and accurately describe his duties and responsibilities as then performed or as performed in the immediate past. Rather, it described duties and responsibilities that Reynolds planned and contemplated for the plaintiff. The Court agrees with Jackson. Reynolds failed to consult with and Jackson did not participate at any stage in the preparation of his new position description. Reynolds' explanation for this failure to seek plain-

tiff's participation or even to show it to him before submission to Civil Service was that he did not want a confrontation with plaintiff, and once again he did not "bite the bullet." Under the circumstances, this failure on the part of Reynolds to face up to a clear responsibility causes the Court to question seriously his motives.

To no one's surprise, Jackson refused to sign the revised position description, asserting that it was totally inaccurate. Plaintiff's position was audited by the Civil Service Commission in the summer of 1973, and his appeal was denied on October 10. The Commission's denial noted that classification appeals are determined on the basis of current duties and responsibilities, and also noted that it could not consider any duties or responsibilities associated with plaintiff's position prior to the 1972 reorganization. But the plaintiff has testified and this Court finds that his duties were not changed with the 1972 reorganization and were not changed between July, 1972 and April, 1973—that the significant changes developed after he appealed to the Civil Service Commission.

### III

Plaintiff filed an Equal Employment Opportunity Formal Complaint on November 15, 1973 alleging discrimination based on race or color, and outlining the events that had transpired since he was recommended for promotion on April 4, 1972. He claimed that his position description and duties were changed in May, 1973, and not with the ARS reorganization in July, 1972. The several attempts to achieve informal resolution at the Department level were not successful. After exhausting available remedies under the Civil Service Regulations, he sought relief in this Court.

Jackson's second discrimination complaint, filed on May 2, 1974, charged various acts of interference, coercion and reprisal by the supervisory officials of Agricultural Research Service arising from his filing and processing the original discrimination complaint in November, 1973. The charges were reviewed and investigated at the agency level. On July 31, 1974, the Department's Director, Equal Employment Opportunity, found and concluded that the charges lacked support and that no corrective action was required.

■ The Court has reviewed plaintiff's testimony and has considered and evaluated the testimony of the various witnesses on the second complaint and rejects the Director's findings. The clear weight of credible evidence shows that shortly following Jackson's position appeal to Civil Service Commission and continuing after his discrimination complaint he was effectively isolated from his previous work assignments by his supervisor Reynolds. He was denied the opportunity of working on projects for which he had had responsibility. For the greater part he was removed from significant laboratory activities and was generally assigned to routine tasks on a random basis. The Court was impressed by and considered the testimony of plaintiff's co-workers, Edward Williams and Benjamin Gadsden as worthy, believable and straight forward. They supported Jackson's assertion that he did little, if any, significant work in the Laboratory and that his then assigned work was far less significant than work delegated to him before he filed the complaint, and that in general he performed low level tasks. On an occasion during this period, Jackson was also deprived of the opportunity of continuing and working on an ongoing project during Reynolds' temporary absence. There was undisputed testimony that several years prior, when Reynolds was on leave pursuing his doctoral degree, Jackson assumed and carried on competently and satisfactorily various important aspects of his work with a minimum of supervision.

■ An aspect of the plaintiff's complaint of interference and reprisals related to the conduct of one of defendant's agents, a personnel specialist, during the latter stages of this litigation. This specialist was Stuart Fields. His actions were such as to destroy any image of the Department as a fair and impartial employer with an even-handed personnel and employer-employee

relation policy. Within several months before trial, he became immediately involved in this proceeding. Upon ascertaining the identity of plaintiff's witnesses he would call and advise them that they were free to talk to plaintiff's attorney, to not talk to plaintiff's attorney, or to talk to plaintiff's attorney only in the presence of the Assistant United States Attorney. He further advised that in his judgment, it would be better if they talked to plaintiff's attorney only in the presence of the United States Attorney.

■ This personal advice was unsolicited. While several of the witnesses testified that it had no effect on them or their testimony, for others it caused reluctance, some reservation and raised a question in their minds as to whether they should become "involved" in the plaintiff's litigation. This was quite apparent from their testimony before the Court. The Department argues that Fields had an obligation to assist in the preparation of its defense. The Court has had opportunity to consider all of the testimony and evidence in this regard, including the testimony of Stuart Fields. His conduct was a clumsy, misguided attempt to derail the plaintiff and an impermissible interference with plaintiff's efforts to effectively assert his rights and discrimination claims. The Department's condonation of Fields' actions is unacceptable and unwarranted. Equally unacceptable is Fields' interpretation of leave regulations to require Jackson to take official leave when his deposition was taken by the government and when he was actually present before the Court to litigate his complaint.

## IV

A witness, Albert Coleman, a black research physiologist, a college graduate with a B.S. degree recounted his experiences as an employee at ARS. He had also been an Equal Employment Opportunity Counselor, who had counseled plaintiff from April through October, 1973. As a research physiologist, he testified about his experiences and difficulties in finally securing a GS–11 promotion in 1972. While serving as a GS–9, even though he had received a GS–11 rating from the Civil Service Commission and sought a promotion to GS–11, he was frustrated and tossed about in his efforts to rise above the GS–9 level. His unchallenged testimony was that he talked to Dr. C. Edith Weir, presented to her evidence of his GS–11 rating from the Civil Service Commission and that in effect she replied *that we don't do things that way here.* He then sought and secured a position audit, without favorable results. A later appeal to ARS Personnel resulted in an unfavorable determination. His final appeal to the Department level bore fruit and he was subsequently promoted. During the course of his employment Coleman had filed several personal complaints of discrimination against ARS. The Department suggests that because of his personal experiences his testimony was biased and must be discounted. The Court finds that Coleman gave a factual and balanced account of his experiences at ARS and that his testimony was quite relevant to Jackson's complaint.

The witnesses Edward Williams and Benjamin Gadsden, biological technicians and co-workers of the plaintiff, are also black. Each had been with ARS for more than 15 years. Their on-the-job experiences were as unfortunate as Jackson's. Williams is a college graduate with a degree in agricultural education. In addition, he has a M.A. degree in administration and adult education. His entry level at ARS was at Grade GS–2. He is presently a GS–9. He, too, was recommended for a GS–11 promotion but later advised by his supervisor, Robert Oltgen that "he could not get it through." In 1957 Gadsden was hired by ARS at a GS–2 level. At the time he had both a B.S. and M.S. degree in agricultural education. Twenty years later, he had progressed to a GS–7 level. He testified that when he sought a GS–9 promotion he was told by Dr. Reynolds that there was no need for a second GS–9 technician.

■ The government argues that an employee's academic education and background are irrelevant to his work and performance as a biological technician. This is

a gross generalization. The Court had opportunity to observe and hear the two witnesses as they testified about their work and assignments in ARS. They were impressive and appeared to be knowledgable. It is difficult to conceive that their college training did not improve and sharpen their ability to analyze, distinguish and differentiate, all useful tools in their work.

In sharp contrast to the Williams and Gadsden situation was the testimony showing that two white employees, lacking college degrees, were more fortunate and secured promotions in due course. They are currently employed at ARS. One was promoted to a GS–10 technician in 1976 and the other to a GS–11 technician in 1970. The government contends that their grade level classification was warranted because they were in fact functioning at the higher levels. The contention is rejected. The reliable evidence showed that the plaintiff, too, was performing above his Grade 9 level. Based on the criteria utilized to advance the two white employees to Grades 10 and 11, there is no support from the testimony or the record to justify in any manner a denial of promotion to Jackson and to promote the two white employees. There is no question that each case rises or falls on its own merits. But considering the facts and circumstances here presented the Department's contention that there are significant differences is a subterfuge and pretext.

## V

■ Several months before Jackson filed his discrimination complaint, the Civil Service Commission conducted a review of Equal Employment Opportunity in the Northeastern Region.* The review, covering the period April 18 to May 3, 1973 was relevant to this litigation. Many areas were found in which top management's attention and commitment to a positive equal employment opportunity program were lacking. Various supervisors were charged with poor personnel practices which affected all employees. The review stated that

the Northeastern Region supervisors were not identifying and counseling underutilized employees and not restructuring jobs to create "bridge jobs" and career ladders. In short, they were not effectively carrying out their personnel management mission and responsibilities.

Four years later Dr. Reynolds testified in this proceeding that at no time had he been briefed or instructed on his personnel management responsibilities since the Commission's review in early 1973. The government may claim that Reynolds was a supervisor who took an interest in Jackson's career development. This indeed was true initially but his attitude and treatment underwent a change when plaintiff began to press for a promotion which he felt was long overdue.

A subsequent Equal Employment Opportunity assessment for 1974 stated:

[W]e still have a distance to go before Blacks and women are near their expected share of the most economically advantageous positions in the Northeastern Region. Our recruiting and career development policies and practices must insure that minorities and women have equal opportunity to compete on the basis of merit principles.

. . . . .

. . . [I]t is incumbent upon each supervisor to make certain that every personnel selection made meets the test of fairness. This means giving every person an equal opportunity to be considered and selecting the best qualified on the basis of merit, without regard to race, color, religion, sex, origin, or age.

A more recent June 1976 review stated:

Although minorities and women are moving into new occupational series, the process is very slow and in some areas progress appears to be decreasing, particularly for minorities. A stronger effort needs to be made to bring about a better distribution of minorities and women in the work-force, especially in the higher

* The Northeastern Region embraces the Beltsville, Maryland facility.

grades particularly in the professional, scientific, and administrative decision-making positions.

Continuing, the review noted:

A major effort should be undertaken to search out those employees holding B.S. or M.S. degrees with research potential and give them the opportunity for professional occupation classification.

The above assessments highlight long existing problems in the Northeastern Region and clearly reflect the work environment in which Jackson sought, but was denied, an equal opportunity for advancement.

## VI

■ During final argument in this proceeding, plaintiff's attorney analogized his client's position to that of a black during the period of our country's slave-labor plantation economy. While the argument may be viewed as excessive, there is no doubt that Charles Jackson, Jr. has been wronged over the span of his employment at the Department of Agriculture. The fair weight and preponderance of the evidence shows that he had good and sufficient reasons to file in November, 1973 an original complaint of racial discrimination in employment and a second complaint in May, 1974, charging interference, coercion and reprisal. It also supports a finding that Jackson has been an unwilling victim of racial discrimination for the greater part of his employment at Agriculture. While the discrimination by the Department may not have been consciously and deliberately practiced by supervisory personnel and other responsible officials, the result has been the same; he has suffered the consequences. If the Department and the ARS have ever had an effective affirmative action program, its operation and effect have not been discernible as applied to the plaintiff. The Department has failed to justify its treatment of the plaintiff.

## LEGAL CONCLUSIONS

The Court has jurisdiction of this proceeding by virtue of Title VII of the Civil Rights Act of 1964, *as amended by* 42 U.S.C. § 2000e, *et seq.*

■ The Court concludes that Charles Jackson, Jr. has carried the burden of proof and met the mandates of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). As a black employee of the Department of Agriculture, he sought promotion to a GS–11 technician position at the Beltsville Agricultural Research Service. He was qualified for the position but was rejected despite his qualifications. As a black employee he was not treated as were white employees similarly situated. He was wrongfully denied promotion because of his race.

The testimony and evidence presented by the government is in large measure contradictory, uncertain and falls short. The defendant has failed to rebut through testimony and evidence that this Court can credit that under all the circumstances the plaintiff was treated fairly under the law and was not the subject of racial discrimination when he was denied promotion as a GS–11 technician.

■ The defendant exercised and engaged in unlawful and impermissible retaliatory acts against the plaintiff following his classification appeal of May, 1973, and his discrimination complaint of November, 1973.

Charles Jackson, Jr. is entitled to appropriate retroactive relief, costs and counsel fees. Plaintiff's counsel shall present an order consistent with the foregoing Memorandum Opinion within ten days.