**Constance G. MINOR, Plaintiff,**

v.

**Joseph A. CALIFANO, Defendant.**

Civ. A. No. 73–1781.

United States District Court, District of Columbia.

May 9, 1978.

Margaret A. Beller, Charlotte B. Hallam, Beller & Nelson, Washington, D. C., for plaintiff.

Earl J. Silbert, U. S. Atty., Robert N. Ford, Asst. U. S. Atty., Steven E. Murray, Sp. Asst. U. S. Atty., Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

OBERDORFER, District Judge.

Plaintiff, Constance Minor, brings this suit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended by the Equal Employment Opportunity Act of 1972, alleging employ-

ment discrimination[1] and reprisal[2] by officials at the Health Services and Mental Health Administration (HSMHA), an agency within the Department of Health, Education and Welfare (HEW).

### I.

In particular, plaintiff, then a secretary, alleges that

1. During extensive absences of her immediate supervisor, Dr. Maurice Bender, she successfully performed the duties of Executive Secretary to the Special Projects Committee, one of the several positions held by Dr. Bender, but was not paid equal pay for this equal work;

2. Mr. Donald Carmody, Director of the Office of Special Projects at HSMHA, discriminated against her on the basis of sex when Dr. Bender left the agency by failing to create a job position in the nature of Executive Secretary to the Special Projects Committee for which she could compete;

3. Mr. Carmody and others failed to fulfill their responsibilities under the agency's affirmative action program. In support of her assertion that Carmody had the duty to consider and create, if feasible, a new position in the nature of Executive Secretary, plaintiff cites a Civil Service Commission regulation regarding equal opportunity which states:

> The head of each agency shall exercise personal leadership in establishing, maintaining, and carrying out a continuing affirmative action program designed to promote equal opportunity in every aspect of agency personnel policy and practice in the employment, development, advancement, and treatment of employees. Under the terms of this program, an agency shall:
>
> *    *    *    *    *    *

(c) Utilize to the fullest extent the present skills of employees by all means, including the redesigning of jobs where feasible so that tasks not requiring the full utilization of skills of incumbents are concentrated in jobs with lower skill requirements  .   .  .. 5 CFR § 713.203.

4. Plaintiff was subject to reprisal for the filing of an EEO complaint; most of her work was withdrawn within four days after she filed the complaint.

### II.

Defendant Joseph Califano, Secretary of the Department of HEW, asserts in defense that

1. HEW could not have discriminated against plaintiff in failing to promote her to the position of Executive Secretary to the Special Projects Committee because this position was merely a duty assigned to a professional series employee, rather than a "job" to which an employee could have been promoted;

2. Although plaintiff may have temporarily performed the duties of Executive Secretary, she did not perform work "equal" to that of a higher paid male employee;

3. Even if there had been a job position of Executive Secretary, it would have been classified at such a high level that plaintiff would have been ineligible to compete for it;

4. Plaintiff has presented no evidence indicating that the decision not to create the job position of Executive Secretary was based on discriminatory motives;

5. The withdrawal of Executive Secretary work from plaintiff after the filing of

---

1. Section 703 of the Civil Rights Act of 1964, made applicable to the federal government in 1972, makes it unlawful for a government agency to

   [D]iscriminate .  .  . against any individual with respect to  .  .  . compensation, terms, conditions, or privileges of employment, because of  .  .  . sex  .  .  ..

2. Section 704 of that Act, also made applicable to the federal government in 1972, makes it unlawful for a government agency to

   [D]iscriminate against any individual .  . because he [or she] has  .  .  . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing  .  .  .

   on account of alleged violations of the Civil Rights Act.

her administrative complaint of discrimination was not only justified under the circumstances but also required by applicable Civil Service Commission regulations concerning merit promotion, reclassification, and the indefinite assignment of duties outside of an employee's job description; and

6. The agency had no specific duty to plaintiff under its declared policy of affirmative action for women and minority groups to consider, and create if feasible, a new position for which she could have competed.

### III.

The Court has conducted pretrial proceedings and a trial *de novo* at which it heard the testimony of several witnesses for both parties, received substantial documentary evidence, and heard extensive oral argument. The Court has received and carefully considered the foregoing together with briefs and proposed findings submitted by both parties.

For reasons more fully stated in Findings of Fact and Conclusions of Law, it is unnecessary to decide whether plaintiff was a victim of discrimination, or is entitled to enforce the HEW affirmative action plan because the Court finds and concludes that she suffered with respect to the terms, conditions and privileges of her employment and was unreasonably delayed in promotion out of the secretarial-clerical category into a managerial administrative category as a consequence of her filing a civil rights complaint.

### IV. *Findings of Fact*

Ms. Minor was hired as a temporary secretary to Dr. Bender at the National Institute of Health in September 1970, at the grade level of GS–6, step 10. In November 1970, Dr. Bender was appointed as an Assistant to the Administrator for HSMHA, GS–15. His duties as such included the organization and oversight of new health projects and programs. Although plaintiff believed that she was qualified for a professional series job, and was then looking for a suitable opening, she moved with Bender to HSMHA and accepted the position of secretary, GS–7, on the expectation (and representation of Bender) that he would eventually have a staff of ten or twelve people and that her career would advance with the growth of the organization.

One of Bender's duties as Assistant to the Administrator was to serve as Executive Secretary to the Special Projects Committee. There was no separate job position of Executive Secretary. The Special Projects Committee was a high level group of people brought together by the Administrator of HSMHA, Dr. Vernon Wilson, to meet monthly and discuss in broad terms where the health delivery system of the United States should be going, and to develop a report that would be sent to the Secretary of HEW for use in developing legislation.

In fulfilling his duties as Executive Secretary, Bender made a special effort to draw plaintiff into the work of the Committee and delegated many of his functions to her. Ms. Minor helped monitor the progress of the committee, arranged meetings, attended meetings with Bender, and wrote some of the minutes of the meetings and progress reports on the work of the Committee. This substantive work was beyond the normal duties of a GS–7 secretary. Plaintiff performed these duties in a fully satisfactory manner. Bender seldom requested that she perform secretarial tasks, for the most part doing his own typing.

In February 1971, Bender suffered a heart attack and was absent from the office until May. Mr. Carmody came into the office in June 1971, as Director of the Office of Special Projects, with approval from the Administrator to design a reorganization plan. When Bender realized that he would soon be reporting to Carmody and that the organizational structure of HSMHA would not be developing as Bender had anticipated (with a staff beyond Ms. Minor reporting to him), he began to lose interest in his job and was frequently absent from the office. This included a two month trip to attend a conference in Europe at the end of 1971.

During Bender's absences, although Mr. Frank Goldsmith as Special Assistant to the Administrator, GS–13, was officially the acting Executive Secretary to the Special Projects Committee, Ms. Minor continued to perform substantive work on Committee matters beyond the normal duties of a GS–7 secretary and demonstrated that she was capable of fulfilling the duties of the Executive Secretary position as it then existed.

Plaintiff knew that her duties were outside of her job description, but performed them because she thought this would lead to a promotion to a professional position. When she learned that Bender would be leaving the office permanently in January 1972, she expected that a job position of Executive Secretary to the Special Projects Committee would be created for which she could compete. The comments on her work had been very positive, she had received an "Excellent" rating on her annual evaluation in 1971, and she had been listed as an underutilized employee since June 1971. In November 1971, on the representation of Bender that the programs of the Special Projects Committee had tapered off and become more managerial than technical, Dr. Laur, Associate Administrator of HSMHA, suggested to Carmody that plaintiff could fulfill the functions of Executive Secretary.

When Bender left HSMHA in January 1972, plaintiff continued to function with respect to the Special Projects Committee as she had previously. However, Mr. Goldsmith, as acting Executive Secretary to the Committee, began to take his supervisory duties more seriously. Because plaintiff was reluctant to give up any of the authority that Bender had delegated to her, some friction and lack of cooperation developed. Mr. Goldsmith testified that plaintiff attempted to maintain exclusive control over project files and would release only specific bits of information. Finally, in early February, on complaint of Goldsmith, Carmody directed Ms. Minor to be more cooperative and to refrain from calling project managers and from visiting the executive suites on the 17th floor. Carmody further directed plaintiff to refrain from performing duties beyond her responsibilities as a GS–7 secretary. Goldsmith stated that plaintiff's cooperation improved greatly after this warning.

In March 1972, Carmody's reorganization plan went into effect, and the duties of Executive Secretary to the Special Projects Committee were officially assigned to Goldsmith (without competition or promotion) by the Administrator of HSMHA, Dr. Vernon Wilson. As with Bender, Goldsmith assumed the Executive Secretary position as part of his normal duties. Plaintiff formally became Goldsmith's secretary at this time. However, Goldsmith already had a secretary and did not need a second one. On April 7, plaintiff filed a timely administrative complaint of discriminatory failure to promote. This complaint was filed in good faith and was not frivolous.

At the time of the filing of her EEO complaint, plaintiff's work relating to the Special Projects Committee consisted of monitoring committee projects and writing status reports. On April 11, Goldsmith requested that plaintiff bring him all of the Special Projects Committee material and informed her that thereafter he would write the Committee reports. Plaintiff viewed this as a reprisal for the filing of her EEO complaint, noting that an EEO counselor, Ms. Goldberg, had interviewed Carmody about the complaint on April 10, one day before the withdrawal of work.

On April 14, Ms. Goldberg had a second conference with Carmody, also attended by Goldsmith. In explanation of the withdrawal of plaintiff's work on April 11, Mr. Goldsmith indicated that in spite of his formal assumption of the Executive Secretary position, plaintiff had remained reluctant to give him information concerning the Special Projects Committee and to let go of the responsibilities she had assumed under Bender. He further indicated that she tried to convey the impression that she was the Executive Secretary and would not accept a secretarial role, e. g., she would not answer the phone and would ask his own secretary to file for her.

Carmody and Goldsmith further stated at the April 14 conference that plaintiff had been "inherited" from Dr. Bender, was no longer needed in the office, and that a suitable placement of plaintiff elsewhere should be arranged. It had previously been suggested by Mr. John Kelso, Associate Administrator for Management, that an "upward mobility" position in the office of a Dr. Cope might be fashioned to utilize plaintiff's prior work experience overseas, Dr. Cope, Carmody, and plaintiff willing. However, Carmody's response to this on April 14 was that Dr. Cope's office was already fully staffed and that such a position would not be feasible. Plaintiff viewed this response as an intentional "blockage" of a promotional opportunity in reprisal for her EEO complaint.

During this same period of time, plaintiff requested and received an informal desk audit of her duties under both Bender and Goldsmith, given by Mr. Jacob Gatrell, Personnel Management Specialist. On plaintiff's description of her work, Mr. Gatrell concluded in his report (plaintiff's exhibit # 29) that

[although it was] difficult to get an accurate fix on what she is presently doing for Mr. Goldsmith, . . . her duties at present are basically non-secretarial and in my opinion are still higher than the grade 7 level.

A meeting was held on April 19 between plaintiff, Goldberg, another EEO official, Goldsmith, and Carmody, at which Carmody explained that Dr. Wilson, Administrator of HSMHA, had been dissatisfied with the development of the Executive Secretary under Bender and had intended to increase the responsibilities of the position through the March reorganization plan and assignment of Goldsmith to these duties. Carmody stated that, for this reason, he had not ever considered the creation of an Executive Secretary position for which plaintiff could compete. Carmody further stated that such a promotion of plaintiff would have been inappropriate and that he would not hire her for this type of job because he did not think that she was capable of any-

thing more than secretarial work. Carmody at one point referred to plaintiff as "excess baggage."

Neither Carmody nor Goldsmith thereafter assisted or attempted to assist plaintiff in obtaining a job position in the professional series (Tr. 135). Ms. Geisbert, Director of the Women's Program at HSMHA, and Ms. Goldberg, EEO Counselor, attempted to help plaintiff gain such a job by setting up appointments where they believed there might be jobs (Tr. 26, 136). Plaintiff went to interviews which they arranged. At one interview, the interviewer, a GS-15, who knew about the complaint which plaintiff had filed, embarrassed plaintiff by remarking that the interviewer did not want to inherit other people's problems and that she would take care of her own people (Tr. 136). Ms. Geisbert also arranged an interview for plaintiff for a GS-9 position for which there was no approved job sheet. The position, if approved, would have involved making the advance arrangements for internal committee meetings (Tr. 141). The person holding the position would be expected to travel to different areas of the United States to set up meetings for an advisory committee, make arrangements for a meeting room, see that there were tablets and pencils, and set up the coffee and the doughnuts. During the meeting the person would not be expected to participate except to take shorthand notes. Upon return from the meeting, the person holding the position would have the task of transcribing a report of the meeting dictated by someone else and preparing travel vouchers for participants (Tr. 140–141). The interviewer for that possible position said it had no promotion potential (Tr. 140). Ms. Geibert, the Director of the Women's Program at HSMHA, considered the offer of such a position to plaintiff in the wake of what had already happened to her to be discriminatory (Tr. 27). Plaintiff considered the potential position to be clerical and without substance, and asked the interviewer to consider plaintiff instead for a position as Information Officer if that position should open up. The interviewer told her he would let her know, but she never heard

from him (Tr. 141). Plaintiff also applied at about this time for a position as a program analyst in the Office of International Affairs after speaking to one of the managers about it. Her application was never acknowledged (Tr. 139).

Plaintiff's principal activity from May to July 1972 related to the office Savings Bond Campaign for which Goldsmith was serving as Chairman. Plaintiff testified that after this work was completed, she had practically no work to do at any level for the ensuing twelve months (Tr. 150). Carmody described her role to be "to help out as best she could as secretary . . . ." Goldsmith spent about two hours per week performing the Executive Secretary functions which plaintiff had performed under Dr. Bender and from which she was now excluded. Goldsmith brought his own secretary with him when he assumed Dr. Bender's duties and had no need for two.

At the trial in this Court, government witnesses—and government counsel—criticized plaintiff for her election to use civil rights rather than civil service procedures as remedy for her grievances, and criticized Dr. Bender for permitting, and the plaintiff for attempting, to do work beyond that called for by her job description as a GS–7 secretary.

With respect to the withdrawal of work from plaintiff, Barbara Prince, defendant's expert witness on classification from the Office of Personnel Management of HEW, testified that management had the duty under Civil Service Commission regulations to match plaintiff's work to her job description either by upgrading the job description or by withdrawing any work from plaintiff which was beyond that position description.

In August 1973, plaintiff was transferred to the Contract Office at the Health Resources Administration as a GS–7 secretary. She was promoted to GS–9 in September 1974, and GS–11 approximately a year later. She is presently serving as a GS–11, Step 3 Contract Specialist in the Health Resources Administration.

In December 1973, the Department of HEW made a final determination that the agency had not discriminated against plaintiff on the basis of sex in failing to create an Executive Secretary position, and had not subjected her to reprisal for the filing of the EEO complaint. This determination was affirmed by the Civil Service Commission Board of Appeals and Review in June 1974, and this action was timely filed.

## V. Conclusions of Law

The parties have litigated and the Court has considered the threshold question of whether the failure to promote plaintiff to the position of Executive Secretary to the Special Projects Committee, was, under the circumstances, disparate treatment sufficient to establish a *prima facie* case of discrimination. It may well be that what appeared to plaintiff to be discrimination against her by the managers because of her sex was, instead, an unreasoned assumption by them about her qualifications because she was a secretary. If this were the fact, there would remain the further question of whether the managers' attitude about secretaries related to the fact that at HEW (and elsewhere) most secretaries are female. There is no occasion here, however, to wrestle with this relatively ephemeral question when the case can be disposed of entirely in terms of the simpler and more straightforward issue of reprisal.

The Court notes parenthetically that, in order to prevail on her broad claim of discrimination, plaintiff would have to overcome the facts that there was no formal job position of Executive Secretary for which she could have competed under merit promotion procedures, and that the position was merely a duty assigned, without promotion, to a professional series employee—an assignment for which plaintiff was ineligible under her nonprofessional classification as a GS–7 secretary. The Court further notes that Goldsmith was not a similarly situated employee. By virtue of the fact that he was a commissioned officer in the Public Health Service, Goldsmith was exempt from Civil Service Commission merit promotion procedures. 42 U.S.C. § 204. Furthermore, the Executive Secretary posi-

tion was only one of the duties assigned to Bender and Goldsmith; Goldsmith testified that he averaged only two hours per week on these duties.

In addition, although plaintiff had performed substantive work commensurate with a GS–9 rating or higher, and had demonstrated that she could satisfactorily perform the functions of Executive Secretary, the agency was, in one perspective, merely following the practice begun with Bender, in assigning these duties to Mr. Goldsmith without a promotion. Mr. Carmody's remarks may have been insensitive. They may reflect a parochial institutional attitude about the ability of secretaries generally. But the remarks did not necessarily evidence an intention to discriminate against plaintiff on the basis of her sex.

Plaintiff has presented no evidence to support her assertion that a similarly situated male would have been treated differently and a new position created for him.

Balanced against these factual and technical considerations are plaintiff's appealing contentions that the acts and omissions by the government managers here were actionable violations of their duties to take affirmative action to fit minority and female employees capable of advancement into appropriate professional series positions. Affirmative action responsibilities of government managers should, it would seem, impose upon them special responsibilities to any minority or female employee, who has demonstrated the ability and will for advancement. Here, for example, the managers considered department efficiency, Mr. Goldsmith's public health officer status, the plaintiff's failure to qualify as a GS–15, and the statute which barred her promotions from GS–8 upward until a person has been a GS–8 for one year. Yet, the managers never considered, in the context of affirmative action, asking appropriate personnel authorities to write a job description for a role like that performed by plaintiff when she worked with Dr. Bender. It may be that, having considered affirmative action values, the managers would have found those values to be outweighed by consideration of office efficiency or by deficiencies in plaintiff's education, experience, and ability. Or the Civil Service regulations and policies may have proved, after testing, to be intractable. But the managers here never even tried.

The HEW affirmative action regulations and plans cited, however, appear by their terms to be general and precatory. Plaintiff has not cited, and the Court has not discovered, any case authority, statute, or regulation establishing an employee's legal right to a particular promotion or job opportunity by operation of the HEW affirmative action plan. Since the case can be resolved on the clearer ground of reprisal, it is unnecessary to decide, as an original question, whether the HEW affirmative action plan imposed on defendant the specific kind of duty that a court is empowered to enforce in the circumstances here.[3] In any event, however, the many details about the managers' actions, the plaintiff's reactions, and the defendant's affirmative action duties furnish the context for the Court's ultimate conclusion that plaintiff was subject to reprisal for the filing of her EEO complaint.

The withdrawal of all of plaintiff's Special Projects Committee work one day after the EEO complaint was brought to the attention of Carmody and the subsequent failure of the managers to give her meaningful work for a substantial period of time proves plaintiff's prima facie case of reprisal. On April 7, 1972, plaintiff filed her EEO complaint. On April 11, 1972, plaintiff was barred from monitoring Special Projects activities and from writing Committee reports. Goldsmith's secretary had pre-empted all other functions available for plaintiff to perform. Plaintiff was left with the office Savings Bond Program, and then with nothing to do. The managers

---

**3.** The Court notes the recently published Report To The Secretary: *Equal Employment Opportunity In HEW*, March 20, 1978, and the Memorandum and Statement by defendant on March 24, 1978, about inadequacies of HEW's earlier affirmative action plans and the defendant's commitment to the strengthening and implementation of them.

made no effort to find other work or opportunity for her. The efforts of the EEO and women's rights specialists were embarrassing and futile. The most likely promotion possibility for which plaintiff was interviewed had unmistakable sexist aspects which management should have sensed would have been repulsive and unacceptable to a person who had weathered the plaintiff's recent experience.

In addition, there was persistent government testimony, emphasized by argument of government counsel, that plaintiff somehow violated the rules and *mores* of government civil service when she did more work than she was supposed to do and that she compounded this error by filing a civil rights law grievance instead of entrusting her future to the civil service "merit" process. These reflections of a hostile official attitude against plaintiff's efforts to overcome what she viewed, with reason, to be discrimination corroborates the circumstantial evidence on which plaintiff's reprisal claim is based: The withdrawal of work from plaintiff on April 11, four days after she filed her civil rights law complaint.

The defense against the reprisal claim seems to be based on the conclusion of Gatrell in his desk audit of plaintiff that her duties prior to the April withdrawal and displacement justified a rating higher than GS–7, and the testimony of Barbara Prince, defendant's expert on classification, that management had the duty under Civil Service regulations to insure that an employee's duties are matched by his or her position description. Therefore, defendant contends, the manager's action, after the complaint was filed, merely executed the pre-complaint decision not to create and give plaintiff an opportunity to compete for an Executive Secretary job and was not causally connected with the complaint itself.

It is true that the desk audit showed plaintiff to have performed beyond GS–7 requirements. It is also true that Civil Service regulations offered an excuse to restrain her advancement. But it is an additional critical fact that affirmative action policy directives offered managers a strong reason to make an effort to fit her tasks to her skills by creating a higher job, instead of idling her. The managers obviously did not fully consider the affirmative action factors when they elected a civil service solution: She should continue as a secretary "as best she could." It is also true that no withdrawal of work decision was physically implemented, until after she filed the civil rights complaint. Until plaintiff filed the civil rights complaint, however, there was always the possibility that these managers (or some superior more sensitive to HEW's affirmative action responsibility) would have seen the vice of the managers' curious decision to withdraw her work and leave her idle and would have at least let execution of the decision fail by inertia. Instead, after the complaint was filed, the decision was implemented firmly and immediately. The Court concludes, from its observation of the witnesses and reflection on their testimony and its circumstances, that the managers acted finally when, and as, they did on April 11 and thereafter, instead of softening their earlier civil service solution, or trying harder to find a meaningful place for her because plaintiff filed a civil rights complaint.

\*     \*     \*     \*     \*     \*

Without deciding whether plaintiff proved a claim for sex discrimination or established any legal right to recover because of defendant's failure to extend to her the benefits of his affirmative action program, the Court holds that she has proved, and defendant has not overcome, a case of reprisal. Her civil rights complaint was not frivolous. It was followed swiftly by final removal of all vestiges of her duties as Executive Secretary, and then, by no work (except with respect to the office Savings Bond Program) and by a 15 month delay before she was able to transfer to relatively meaningful work and begin to earn promotion to a professional series job.

Thus, plaintiff suffered adversely with respect to the terms, conditions and privileges of her employment coincidental with, and as a reprisal for, the filing of a civil rights complaint alleging defendant's fail-

ure to provide the opportunity to which she believed that she was entitled under the defendant's affirmative action plan. Accordingly, it is this 9th day of May 1978, hereby

ORDERED: That on or before May 19, 1978, each party shall file a proposed judgment providing relief for plaintiff. Each party may file a response to the judgment proposed by the opposing party on or before May 25, 1978, and it is

FURTHER ORDERED: That a hearing to settle the judgment is scheduled for 3:00 P.M., May 26, 1978, in Courtroom No. 4, U. S. Courthouse, Washington, D. C.