Janet L. BROWN

v.

**Francis X. BIGLIN, in his capacity as Regional Postmaster General.**

**No. 76–355.**

United States District Court,
E. D. Pennsylvania.

July 18, 1978.

Andrew F. Erba, Community Legal Services, Philadelphia, Pa., for plaintiff.

David W. Marston, U. S. Atty., Alexander Ewing, Jr., Asst. U. S. Atty., Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Plaintiff Janet L. Brown ("Brown") brought this suit[1] to redress the alleged retaliatory treatment experienced in her employment as a mailhandler with the United States Postal Service ("Postal Service"), in violation of § 717(a) of the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–16(a), *amending* Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Brown alleged in her complaint that her discharge from employment with the Postal Service was in retaliation for her having filed a complaint with the Equal Employment Opportunity Office ("EEO") of the Postal Service, which charged her supervisors with harassment and favoritism.[2] The case was tried *de*

---

1. Prior to filing her complaint in this action, Brown, on January 7, 1974, filed an informal complaint with the Postal Service Equal Employment Opportunity ("EEO") Office charging employment discrimination. When Brown's informal complaint was not resolved in her favor, she filed a formal complaint dated January 24, 1974, with the same office, which alleged that she was discharged from the Postal Service because of discrimination based upon sex, race and creed and because of reprisal for her utilization of the EEO procedure. On December 12, 1974, the United States Civil Service Commission Complaints Examiner conducted an extensive hearing concerning Brown's formal complaint and reported on February 13, 1975, that the evidence did not support her complaint of discrimination or her allegation of reprisal.

On February 20, 1975, the Postal Service issued a "Disposition of Complaint of Discrimination" which concurred with the Complaints Examiner's findings of no discrimination or reprisal against Brown. This agency decision was appealed to the United States Civil Service Commission Appeals and Review Board where, in its decision of January 6, 1976, the Board affirmed the decision of the Postal Service. On February 6, 1976, Brown filed her complaint and a motion for leave to proceed *in forma pauperis* in this Court, which motion was granted on February 9, 1976.

2. Brown's original complaint in this action alleged discrimination by the Postal Service on the basis of race, sex and reprisal. However, pursuant to a Fed.R.Civ.P. 15(a) stipulation to

*novo*[3] before this Court and, pursuant to Fed.R.Civ.P. 52(a), we make the following findings of fact and conclusions of law.

### FINDINGS OF FACT

On April 9, 1973, Brown, a black female resident of Philadelphia, Pennsylvania, was hired by the Postal Service as a part-time mailhandler, Postal Service Level 4, Flexible Schedule, with the General Post Office at 30th and Market Streets in Philadelphia. Brown and approximately 20 other new, part-time flexible mailhandlers were assigned to work on Tour Two, Incoming Mails, Third Floor, where the mailhandlers unloaded and moved incoming bulk mail from the truck terminal and various conveyor belts for processing. All new employees with the Postal Service work as probationary employees for 90 days before they become eligible for regular employment. During this probationary period, the Postal Service can terminate a new employee for any reason.

### 1. *Brown's One-Day Suspension*

In April of 1973, Brown worked on Tour Two, Paper Side, under the supervision of Group Leader Charles C. Lane, Jr. ("Lane"), and Foremen of Mails William J. Buchanon ("Buchanon") and Herbert E. Katz ("Katz"). From the beginning of her employment with the Postal Service, a personality conflict developed between Brown and her supervisors, Buchanon and Lane. On May 17, 1973, Buchanon assigned Brown to sort mail items from non-mail items as they passed her on a particular conveyor belt.[4] Brown became upset because the speed of the belt, which was controlled by Buchanon, was so fast that she was unable to effectively remove the mail from the belt as it moved, and because she was the only mailhandler assigned to sort mail on this belt. Brown thereupon left her work station without permission to talk with her uncle, who worked in a different location in the General Post Office. When Brown returned to her work station 20 minutes later, Buchanon called Brown to his desk and advised her that a Postal Service employee is prohibited from leaving an assignment without first obtaining permission from either a group leader or a foreman. As a result of this discussion, Buchanon determined that Brown was uncooperative and that he was unable to communicate with her with respect to the rules of the Postal Service. Consequently, Buchanon recommended a one-day suspension from work for Brown, even though he knew that he could have recommended dismissal of Brown from the Postal Service because of her probationary work status.[5] On the same day that Brown left her work assignment, she requested and obtained permission to visit the Postal Service EEO to obtain advice from EEO Counselor Jacqueline Tate ("Tate"), and to initiate an informal complaint charging Buchanon with discrimina-

---

amend the complaint, approved by this Court on September 7, 1977, Brown filed an amended complaint which alleged only reprisal.

**3.** See *Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976).

**4.** At the end of this conveyor belt, also known as the "junk belt," the non-mail items, which often include trash and other debris, fall into a trash hamper. Consequently, any loose mail that is not removed from the "junk belt" by the mailhandler must later be extricated from the trash hamper. Movement of the belt is controlled by a pushbutton switch at the front end of the belt where the mail is unloaded.

**5.** Buchanon's reasons for recommending a one-day suspension for Brown were as follows:

This employee left her assignment without permission at approximately 0825, on Thursday May 17, 1973.
When she returned at 0845, I attempted to talk to the employee so that I could advise her that she should not leave her assignment without getting permission either from her supervisor or her group leader. The employee would not say anything. When I insisted on an answer her reply was—"I went to the office."
This employee's attitude is very poor, she seems to resent being told anything. I am unable to communicate with this employee, and without communication nothing can be accomplished. Therefore I recommend a One (1) day suspension. This is not intended to be punitive but merely an attempt to rectify this employees [*sic*] short coming [*sic*]. [Ex. D–2.]

tion. Brown's request to visit the EEO was not unusual, because many employees secured permission to leave their work areas to obtain counseling from the Postal Service EEO.

On June 5, 1973, Brown received a Notice of Disciplinary Action from the Postal Service which approved Buchanon's recommendation of a one-day suspension, effective June 12, 1973, for Brown's behavior on May 17, 1973. After Brown received the notice of suspension, she circulated a petition among her co-workers charging Buchanon and Lane with "favoritism" and "unnecessary harassment."[6] The petitioners, including Brown and 11 other mailhandlers, discussed the charges with Buchanon's supervisors, General Foreman Leroy Hall ("Hall") and Coordinator Joseph J. DiGiacomo ("DiGiacomo"), before they submitted the petition to EEO Counselor Tate. Subsequent to the circulation of the petition, Buchanon was transferred by his supervisors from Tour Two, Paper Side, to a different section of the third floor.

### 2. *Brown's Three-Day Suspension*

A number of Postal Service mailhandlers had problems working under the supervision of Group Leader Lane, and one employee observed an immediate personality conflict between Brown and Lane because Brown was so outspoken at work. On August 8, 1973, Lane assigned Brown and co-worker Valerie Gant ("Gant") to work on Opening Mail Belt No. 3. In order to expedite the moving of the mail, Lane requested that Brown move from her position along the belt to an empty space adjacent to Gant. Brown objected because, if she

moved, she would no longer be able to utilize a floor bar which enabled her to elevate herself so as to be able to fully reach across the belt. Although Gant volunteered to move into the open position, Lane insisted that Brown comply with his direct order to change her work position along the belt. When Brown refused to move to the vacant position, Lane completed Postal Service Form 13, commonly known as a "buck slip," which reported Brown's infraction of the Postal Service rules. In addition to Brown's refusal to obey a direct order issued by a group leader, Lane reported to his supervisors that Brown addressed him with obscene language as Lane passed by Brown near Belt No. 3.[7] Lane submitted the "buck slip" through normal channels to his supervisor, Foreman Katz, who recommended another suspension. In order to avoid another suspension, Brown wrote a letter [Ex. P–2], dated August 21, 1973, to Postmaster Vincent J. Logan wherein she denied the use of obscene language to Lane and argued that Lane's harassment and false charges were based on a personality conflict between herself and Lane caused by her previous filing of an EEO complaint against Lane and by Brown's having joined the National Alliance of Postal and Federal Employees instead of the Mailhandlers' Union. On August 29, 1973, Brown received a Notice of Disciplinary Action [Ex. D–3], submitted by Foreman Katz and approved by Coordinator DiGiacomo, advising Brown of her three-day suspension from work, effective September 3, 1973, because of the mail belt incident with Lane. Upon receipt of this notice, Brown filed an informal complaint with the Postal Service EEO alleging

---

**6.** The petition, addressed to EEO Counselor Tate, stated as follows:

> We the undersigned, feel it's our duty, to report the unjust treatment and constant discomfort felt on the Third Floor, Tour Two Paperside. We feel that there is a display of "Favoritism", and a large amount of unnecessary "Harassment". That's how we all have come together to file this over-due [*sic*] complaint against Mr. Buchanon. One of tour two's Supervisor [*sic*], and Group Lead-

er Lane. We like our Job, Tour, and each other as working people, we have to work. To be govern [*sic*] by those who show, and display, outrageous, and very unprofessional "Favoritism" makes it hard to enjoy your work, knowing that we have to work. We seek releif [*sic*] through your office. [Ex. P–1.]

**7.** *See* Ex. D–3 for Lane's description of the incident and the language used by Brown.

harassment on the basis of sex.[8] This complaint was investigated and on October 2, 1973, EEO Counselor John R. Brooks advised Brown that she had the right to file a formal written complaint if the matter were not resolved to her satisfaction. [See Ex. D–4.] Brown did not file a formal EEO complaint with respect to her three-day suspension.

### 3. Brown's Discharge from the Postal Service

On October 13, 1973, Brown was promoted from a part-time flexible mailhandler to a full-time mailhandler. On November 17, 1973, at approximately 20 minutes before the noon lunch break, Brown left her job assignment in the mail bundles "throw off" area to go to the restroom because she was feeling ill. Brown did not obtain permission from her group leader or foreman to leave the work area because of the emergency nature of her illness. Foreman Arthur L. Klein ("Klein"), a new foreman in the Tour Two, Incoming Mails section of the General Post Office, observed Brown leaving her assignment without permission and noticed that Brown was carrying a brown paper bag.[9] Klein, assuming that Brown was leaving her assignment early to have lunch in the "swing room," called Brown and informed her that it was not yet time for lunch. Brown ignored Klein and continued to walk away from her assignment at a fast pace. Klein then told Brown that, if she did not return to her work assignment, he would write a "buck slip" reporting to his supervisors Brown's infraction of the Postal Service rules. Brown refused to obey Klein's order to return, and responded with abusive and obscene language. Although profanity is commonly used on the work floor of the General Post Office, obscene language is rarely directed personally toward supervisors by employees. Klein testified at trial that, before the incident with Brown in November of 1973, no employee had directed profanity toward him as a supervisor. However, as in the incident with Lane, Brown denied the allegation that she had used abusive and obscene language in addressing Klein. Upon consideration of the demeanor of the witnesses and of all of the evidence adduced at trial, we find Klein's testimony concerning Brown's use of obscene language to be the more credible version of the incident. *Accord,* Findings of Fact and Recommended Decision of EEO Complaints Examiner, dated February 13, 1975, at 10.

When Brown returned to her assignment in the "throw off" area, she made no attempt to explain to Klein the reasons for leaving her work station without permission; nor did Klein inquire about Brown's refusal to follow his direct order because, on the basis of Brown's abusive language, he felt that it would be unwise to have further conversations with her. Klein subsequently described the incident in a "buck slip" [Ex. D–5], and recommended that, "in view of Brown's current action and past indifference," Brown be dismissed from the Postal Service. Klein's recommendation for Brown's discharge was not made in reprisal for her EEO visits and complaints because, as a new supervisor in the Tour Two, Incoming Mails section of the General Post Office, Klein was unaware of any of Brown's EEO activities or of Brown's earlier suspensions, but rather was based upon Brown's insubordination and profanity.

After receiving Klein's "buck slip" recommending Brown's discharge from the Postal Service, General Foreman Hall reviewed Brown's personnel record. [See Ex. P–5.] Although Brown's use of obscene language to a supervisor was a factor in his decision, Hall approved the recommendation for dis-

---

8. In a pre-EEO case log form, dated September 10, 1973, EEO Counselor Tate reported that Brown charged that Lane's treatment of her "in a demeaning and different manner" than that enjoyed by male employees was "union motivated." [Ex. P–6.]

9. Brown testified that, because large handbags and pocketbooks were not allowed on the work floor of the General Post Office, she carried her personal effects in a brown paper bag.

charge primarily because of Brown's two prior suspensions. Further, Brown's utilization of the EEO services was not considered by Hall as a ground for her discharge from the Postal Service because Hall believed that the EEO should be used by all aggrieved Postal Service employees. On November 20, 1974, Hall, together with Klein, Tour Coordinator R. A. Kennedy and Mail Processing Representative C. G. Baugh, recommended to the Postmaster in Philadelphia that Brown be discharged from the Postal Service. On December 3, 1973, Brown received an Advance Notice of Discharge and on January 3, 1973, the Postal Service discharged Brown for leaving her assignment without permission, refusing to obey a direct order given by a supervisor and using obscene and abusive language to a supervisor. Brown was not discharged for her utilization of the EEO counseling facilities and complaint procedures available to Postal Service employees.

## DISCUSSION

█ In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court established the order and allocation of proof in a private, non-class Title VII action challenging employment discrimination. In the case of an alleged retaliatory discharge, it is the burden of the plaintiff to establish a *prima facie* case of retaliation by showing that: (1) the employee engaged in activity protected by Title VII, such as participation in EEO proceedings; (2) the employer knew that the employee participated in protected activity; and, (3) the employee was discharged following participation in protected activities within such period of time and in such a manner that the court can infer retaliatory motivation. *Id.* at 802 n.13, 93 S.Ct. 1817; *Hochstadt v. Worcester Foundation for Experimental Biology, Inc.,* 425 F.Supp. 318, 324 (D.Mass.), *aff'd,* 545 F.2d 222 (1st Cir. 1976). Once the plaintiff establishes a *prima facie* case of employment discrimination, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the action taken against the plaintiff. *Id.* at 411 U.S. at 802,

93 S.Ct. 1817; *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 399 (3d Cir. 1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977). Once the employer demonstrates a legitimate, nondiscriminatory purpose for its action, the burden shifts back to the plaintiff to show that the employer's stated reason is a mere pretext for discrimination prohibited by Title VII. *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 804–806, 93 S.Ct. 1817; *Hicks v. Abt Associates, Inc.,* 572 F.2d 960, 968 n.11 (3d Cir. 1978).

█ Applying the above standards to the facts of the case before us, we find that Brown has failed to establish a *prima facie* case of employment discrimination based upon her suspensions and discharge from the Postal Service. There is no dispute that Brown's utilization of the EEO constitutes activity which is protected by Title VII, or that Buchanon and Lane knew that Brown and other mailhandlers often requested permission to visit the Postal Service EEO. However, although Brown has satisfied the first two elements of the applicable standard for establishing a *prima facie* case of discriminatory reprisal, Brown has failed to establish that her discharge was within such a period of time of her visits to the EEO and in such a manner that would support an inference of retaliatory motivation. Klein, unaware of Brown's regular visits to the EEO, recommended shortly after the November 17, 1973, incident that Brown be discharged because of Brown's violation of Postal Service rules. Klein's timing and manner in recommending Brown's discharge do not support an inference of retaliatory motivation for Brown's utilization of the EEO for counseling and complaints. Foreman Hall, an advocate of the EEO for aggrieved employees, approved Klein's recommendation for Brown's discharge only upon the grounds of Brown's insubordination with Klein and of Brown's prior disciplinary record, and not because of her involvement with the Postal Service EEO. We find therefore, that Brown has failed to establish a *prima facie* case of employment discrimination violative of Title VII.

### CONCLUSIONS OF LAW

Any factual references under the "Discussion" section of this Memorandum shall be considered as our findings of fact in addition to those set forth under "Findings of Fact," and any conclusions of law contained in the "Discussion" shall be deemed our conclusions of law in addition to those set forth in this section.

The Court has jurisdiction over the subject matter of this action pursuant to § 717(c) of the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–16(c), *amending* Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The plaintiff has not established by a preponderance of the evidence a *prima facie* case of employment discrimination by the Postal Service. The Postal Service did not discriminate against Brown during her employment with or in her discharge from the Postal Service, and the Postal Service did not act in retaliation against Brown for her proper and protected pursuit of relief through the EEO. We hold, therefore, that the Postal Service has not discriminated against Brown in violation of Title VII and that the defendant is entitled to a judgment in its favor and against the plaintiff.

An appropriate Order will be entered.