James P. JONES, Plaintiff,

v.

Richard A. LYNG, Secretary of
Agriculture, Defendant.

Civ. A. No. 85–3607.

United States District Court,
District of Columbia.

Nov. 18, 1986.

Andrew L. Lipps, Whitman & Ransom, Washington, for plaintiff.

Linda A. Halpern, Asst. U.S. Atty., Washington, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

Trial of the above captioned matter took place from April 15 through April 24, 1986. In addition to the oral testimony, there has been extensive discovery on both sides in the form of depositions and documents. The matter has been fully briefed. On the basis of the foregoing submissions, the court enters the following Findings of Fact and Conclusion of Law.

## FINDINGS OF FACT

1. Plaintiff James P. Jones is an employee of the Agricultural Stabilization and Conservation Service (ASCS), an agency of the United States Department of Agriculture (USDA), which has branches in each of the fifty states. Defendant Richard Lyng is the Secretary of Agriculture.

2. Plaintiff has brought this action under § 704 of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–3, *et seq.* He contends that the removal of most of his duties in August, 1984 and his transfer from Texas to Washington, D.C. in November, 1984—after serving more than twelve years in the Texas ASCS office—were in reprisal for his opposition to and disclosure of alleged sexual harassment of female employees by top ASCS officials in Texas. He also contends that reimbursement for temporary housing expenses which he incurred in Washington, D.C. in March, 1985 was denied to him in reprisal for his protected conduct.

3. On August 10 and 17, 1984, he filed an administrative complaint under Title VII contesting the removal of his job responsibilities. On December 6 and 11, 1984, he filed an administrative complaint under Title VII challenging his transfer to Washington, D.C. On April 9, 1985, he filed an administrative complaint under Title VII contesting the denial of reimbursement for temporary housing expenses.

4. On December 2, 1985, ASCS issued a "Proposed Disposition" denying these claims. Plaintiff did not accept such disposition and appealed to the Secretary of Agriculture; the Secretary has not rendered a final decision. Plaintiff filed his lawsuit more than 180 days after each of his administrative complaints was filed. Plaintiff has exhausted his administrative remedies.

5. The record of this litigation is filled with personal charges and countercharges that are largely irrelevant to the factual and legal issues which confront the court. Many of the facts are not disputed; it is the inferences therefrom which are challenged.

### A. *Organization of ASCA*

6. The Washington, D.C. headquarters of ASCS has responsibility for the administration of the ASCS programs and its of-

fices throughout the fifty states. Authority for handling personnel matters involving ASCS employees in any state or county office (except for certain matters involving political appointees) is vested in the Deputy Administrator for State and County operations (DASCO) and his staff. The principal persons in the Washington, D.C. headquarters of ASCS who were involved in the decision to transfer plaintiff were Milton Hertz, DASCO; Roy Cozart, Assistant DASCO; Alfred Oberg, Southwest Area Director; Elmer Dovel, Director, Personnel Division; and Randall Mayes and John Chott, personnel specialists.

7. Each state ASCS office is headed by a State Executive Director (SED) and supervised by a State Committee, which meets monthly for two to three days. Approximately 75% of the Texas State Committee meetings are held in College Station; the remainder are held at various cities throughout Texas. The SED and State Committee members are political appointees. Wayne Mayfield has served as SED of the ASCS Texas State office in College Station, Texas since July, 1981. At all times relevant hereto, the members of the Texas State Committee (STC) were Roy Jacoby, Chairman; Zack Fisher, Harold Thomas and Worth Matteson.

8. The second-ranking position in the Texas State Office (STO) is Assistant to the SED and STC, which is a civil service position. Texas is the only state which has such a position. It was created in the 1960's to reward a long-time and highly capable ASCS employee, Jack Bradshaw. Plaintiff replaced Mr. Bradshaw in May, 1972 and remained in that position until his transfer to Washington in November, 1984.

9. The STO has five divisions, each with a Division Chief and one or more program specialists. In addition, ASCS has offices in virtually all of Texas' 250 counties; each office is headed by a County Executive Director (CED) and supervised by a County Committee (COC). The counties are grouped into twenty-one districts, each supervised by a District Director (DD), which director supervises ASCS operations within his district and is responsible for providing program information to the counties as well as reporting county problems to the STO. The DDs attend monthly conferences at the STO where they are briefed on the latest program material from Washington.

### B. *Plaintiff's Employment History and Performance 1969–1981*

10. Plaintiff James P. Jones began his employment with ASCS in March, 1969 when he was appointed Southwest Area Director by the Nixon Administration. Jones had long been active in the Republican party and served as Chairman of Farmers and Ranchers for Richard Nixon and Farmers and Ranchers for Congressman Bob Price during the 1968 campaign. When he received his appointment Jones moved to Washington and his family, including a son afflicted with cerebral palsy, remained in Texas. He remained in Washington until 1972.

11. During his tenure as Southwest Area Director Jones assisted in the removal of two Texas DDs, one of whom was subsequently replaced by Jones' longtime friend Terry Harmon. Mr. Harmon ultimately succeeded Jones as Southwest Area Director. In 1972 Jones ran into trouble with ASCS Administrator Kenneth Frick when spot checkers noted irregularities with respect to set-aside acreage on Frick's California farm. Jones refused to fire the spot checkers and Frick was ultimately required to repay a portion of the funds disbursed to his farm. Jones contacted Senator Tower's office and informed Tower aides that the Frick situation could cause embarrassment to the administration. Frick by way of retaliation relieved Jones of his position and designated him "Confidential Assistant to the Administrator."

12. Not content with this demotion, Jones sought an opportunity to return to Texas; he sent a memo to the Acting DASCO advising that the Assistant to the SED/STC position in Texas was vacant and that "the filling of this position as soon as possible is imperative." In addition, he contacted Senator Tower's office and Congressman Price. Zack Fisher, who was

then a legislative assistant to Senator Tower, met several times with the STC and with SED David McElwrath, who advised that it was Senator Tower's wish that Jones be given the position of Assistant to the SED/STC. Jones subsequently got the GS-14 job in early 1972 and moved back to Texas.

13. Plaintiff served as Assistant to the SED from 1972 to 1981. During this period he worked for five different SEDs, all of whom had problems with his performance. Indeed, Jones did not even receive performance ratings in 1974 and 1976-79, and the rating he received in 1975 was denoted "advisory."

14. Former SED David McElwrath, for whom Jones worked from February through July, 1972, testified that, although he gave Jones program manuals to study, Jones made no effort to learn the ASCS programs, that plaintiff never performed GS-14 work and that successor SEDs had the same problems with plaintiff. He testified that plaintiff's strength was that everybody liked plaintiff personally.

15. Bland Harrison, SED from July, 1972 to July, 1973, stated that Jones' performance was "not effective" and that Harrison, the Division Chiefs and Jones together performed the job of Assistant to the SED/STC.

16. SED Robert Spreen (July, 1973 to July, 1977) was likewise unimpressed with Jones' performance. Donnie Bowman, Chief of the Administrative Division at the STO since 1972, stated that he and Spreen discussed duties they could assign to Jones that he would be capable of performing. They ultimately gave Jones responsibility for District Director travel itineraries—which Bowman described as GS-5 secretarial work. Spreen did not give Jones formal performance evaluations, because he did not wish to lie and recognized that Jones would appeal if given the rating he deserved.

17. Leonard Williams served as SED under the Carter Administration from September, 1977 through July, 1979. Although Williams testified that Jones' performance was satisfactory he admitted that during his tenure he sought to abolish the position of Assistant to the SED/STC. Moreover, during the second year of Williams' tenure, Jones was relieved of all of his major duties, including supervision of the District Directors, chairing District Director conferences, and serving as the Acting SED in Williams' absence. Jones did not regain any of these duties until 1981 when, as acting SED, he reassigned them to himself. Indeed, in August, 1978 the STC gave Donnie Bowman the title of Assistant to the SED. Jones was given the Emergency Livestock Feed Program because he had no other duties to perform. Finally, Williams himself received a performance rating of "2" (less than satisfactory) from the STC.

18. Williams left under a cloud in July 1979 and Stephen Pringle replaced him in September. During the brief interim the STC appointed Donnie Bowman as Acting SED. Pringle in his deposition was outspoken when it came to describing Jones:

> The best way to describe Mr. J.P. Jones' performance in his job as Assistant to the State Committee was incompetence, in a single word. J.P. Jones ... never learned the details of a single program. He had no knowledge of the programs that he was supposed to be responsible for. He could not be given the responsibility to attempt to manage a program, much like would be expected of any other employee up there in the state office.

Pringle Depo. at 14.

With respect to the Emergency Livestock Feed Program, Jones placed the STO in a "deficit situation" with ASCS headquarters, because he failed to provide the necessary material to justify the eligibility of various counties. Pringle in his deposition testimony stated that shortly after he assumed office he received such complaints from Washington officials that he assigned two District Directors, Wayne Worley and Wayne Mayfield, "to straighten out the mess that had been created by J.P. Jones in his monitoring of that program and his operation of it." (Pringle Depo. at 14, 15). Thereafter Pringle assigned STO employee Buddy Hedges to assist Jones, "in operat-

ing a program that should have been able to be run by a GS–8 or 9," and relied on Hedges to keep him apprised of all developments, "simply because J.P. Jones had no knowledge of the program." (Pringle Depo. at 16–17).

In addition to Jones' inept performance, Pringle indicated he was a troublemaker. When Pringle directed Jones to attend a training meeting in Dallas, Jones not only complained to Pringle, but lobbied other STO employees to voice objections. Pringle ultimately had to threaten Jones with disciplinary action in the event he refused to attend the meeting.

Despite his dissatisfaction with Jones' performance, Pringle gave him a satisfactory performance rating in August, 1980, which Pringle termed "generous." Pringle explained that with the November, 1980 election only a few months away "I didn't think it served any purpose for me to award him a whole lot lower rating when I had only two months left in my term of office." (Pringle Depo. at 48).

19. ASCS officials explored means of seeking Jones' removal from the STO during the 1978–81 time period. From mid–1978 through 1980 Southwest Area Director Robert Melbourne expressed to Elmer Dovel, Director of ASCS Personnel, on several occasions his desire to remove Jones for poor performance, but Dovel advised that until someone was willing to document Jones' performance deficiencies nothing could be done.

20. Jones acknowledged that ASCS Washington officials wanted to remove him from the STO between 1977–80 but asserted that they were motivated solely by political considerations. Jones even initiated a conversation with Pringle regarding the removal of Jones' duties with hope of obtaining evidence of "political discrimination." For this purpose he carried a tape recorder concealed beneath his suitcoat. Jones bungled his "undercover operation" when the tape recorder began clicking audibly; claiming that something was wrong with his heart, Jones raced out of the room and jumped into his car, only to return a half hour later in apparently healthy condition. Jones admitted that Pringle said nothing indicative of political discrimination.

While there is no question that ASCS is a highly political agency, Jones' assertion that his problems under SEDs Williams and Pringle were attributable solely to politics is not believable. Jones' duties were assumed by professed Republicans such as Wayne Mayfield, Buddy Hedges, and David McElwrath, as well as by Donnie Bowman. Jones' twisted thinking was evident in his explanation that Pringle deliberately sent Republicans Mayfield and Hedges to an important Denver meeting on the Emergency Livestock Feed Program in order to confound Jones' charges of "political discrimination." Pringle testified in his deposition that Jones, refusing to acknowledge his shortcomings, responded to any kind of criticism in a negative manner and could not accept direction. Later Wayne Mayfield was to encounter similar problems as SED.

21. In December 1980 the Personnel Division of the ASCS Kansas City Management Field Office conducted a Personnel Management Evaluation of the STO. The report stated that Jones was not performing most of the duties in his position description and concluded that either the position had to be downgraded to a GS level commensurate with the duties performed or the duties in the position description had to be reassigned to Jones.

## C. The Contest for SED

22. When the Republicans prevailed in the 1980 election they placed appointees in high level positions within ASCS, as well as on the various State committees. On January 21, 1981, new Southwest Area Director Al Oberg designated Jones as the Acting SED/STC for Texas pending selection of a permanent SED. Jones was the highest ranking Republican in the STO at the time, and he and Oberg had been friends for many years. Indeed as Southwest Area Director, Jones had previously selected Oberg for the SED position in New Mexico. The same day, Jones prepared a memorandum stripping Donnie Bowman of Jones'

former duties and assigning Bowman the Emergency Livestock Feed Program.

23. While Acting SED, Jones lobbied for the SED job, contacting Zack Fisher (who was himself interested in a position on the STC), Senator Tower's office, and several influential Texas Republicans. Initially the chief contenders for SED were Jones and former SED David McElwrath. In April, 1981 Wayne Mayfield entered the race. Mayfield had been employed with ASCS since 1966, serving as a County Executive Director and, since 1971, as a District Director. Mayfield was ultimately appointed in July 1981, leaving Jones disappointed that in a Republican Administration he was once again consigned to the number two slot under a man whom Jones had previously supervised.

### D. *Jones' Performance Problems Under Mayfield*

24. Described by his superiors as a workaholic and the best SED in the country, with an extensive knowledge of ASCS programs, Mayfield was well aware of Jones' performance deficiencies. Mayfield voiced concerns regarding Jones early on, and in December, 1981 the matter was formally discussed during an Executive Session of the STC. Mayfield's chief criticisms were that Jones did not have sufficient program knowledge and lacked leadership ability. He sought permission to reassign Jones to duties he could better handle and to have one of the DDs run the DD conferences.

25. Despite Mayfield's concerns, the STC would not permit him to reassign Jones or to rate him less than satisfactory in 1982 and 1983. This was due largely to the influence of Zack Fisher. Fisher regarded himself as a friend of Jones through 1983, though his support of Jones was primarily political. Jones had contributed money and time to Republican candidates, and Fisher had been instrumental in getting Jones the job as Assistant to the SED in 1972 (see Finding 12). Fisher therefore persisted in encouraging Mayfield to work with Jones.

26. The parties have stipulated that Mayfield gave Jones a presumptive 4.0 rating (exceeds acceptable) in August 1981 when Mayfield had only been in office a month. By 1982, however, Mayfield had determined to give Jones a less than satisfactory rating. He was prevented from doing so by Al Oberg who, like Fisher, insisted that Mayfield raise Jones' rating to a 3.0 (satisfactory). Oberg admitted that the reason he did so was that he felt Jones was a "good Republican" who deserved a chance. Jones, however, refused to sign his 1982 performance evaluation, because he felt it was too low.

27. In June, 1983 at an STC meeting in San Antonio, Mayfield again expressed his desire to rate Jones as unsatisfactory. Once again Oberg and Fisher were adamant that he not do so because Jones was a "good Republican." The STC members nevertheless agreed that Jones "had a whole lot lacking." Cozart advised Mayfield and the STC that it was difficult to make an unsatisfactory performance rating "stick," and that if Mayfield wished to give Jones an unsatisfactory rating in 1984 he would have to document Jones' performance. As a result, Mayfield gave Jones a 3.0 rating in 1983 which Jones again refused to sign.

28. Although responsible for preparing weekly activity reports for the Area Office, beginning in March, 1983 Jones failed to turn in several reports and submitted others beyond the deadline for telecopying to Washington. In the period of June, 1983 Jones simply stopped preparing the reports and Mayfield was forced to do the work himself.

29. In September, 1983, Mayfield assigned DD Wayne Worley to chair that month's DD conference and asked DD William Blevins to do so in October. In November, Mayfield permanently assigned the job to Worley. The monthly conferences are the chief means of instructing DDs regarding program interpretations so that the county offices can make appropriate producer eligibility determinations. There is convincing evidence that Jones had done a poor job of running the conferences.

30. In October, 1983 Mayfield drafted a letter of reprimand concerning Jones' per-

formance and unacceptable attitude. When Mayfield contacted the Director of the ASCS Personnel Office, Elmer Dovel, and Employee Relations Specialist John Chott, however, they advised Mayfield that a letter of reprimand was not appropriate in performance cases and that Mayfield should begin documenting Jones' performance inadequacies and counseling him if Mayfield wished to take action on the basis of Jones' poor performance. Chott again conferred with Mayfield in late February or early March 1884 regarding Mayfield's progress with Jones. Mayfield told Chott that there had been no improvement, and Chott advised Mayfield to continue to document his problems with Jones' performance.

31. On November 1, 1983 Mayfield conducted a counseling session with Jones. At that time Mayfield informed Jones that he would no longer be Acting SED in Mayfield's absence and that a DD would be permanently assigned to chair the DD conferences. Mayfield relieved Jones of his Acting SED responsibility because he could not rely on Jones to keep him informed of important phone calls and information and because Jones would sign off on anything placed on his desk, whether appropriate for mailing or not. Jones replied that Mayfield was against him and that he had not been given a proper chance to perform. Jones threatened that he would prove that Mayfield was mismanaging the STO. Jones, while having no recollection of the November 1, 1983 counseling session, admitted, however, that Mayfield was critical of him "most of the time" and that on one occasion after a lengthy discussion Mayfield informed him "this was a counseling session." Mayfield conducted additional counseling sessions with Jones on November 14, 1983, March 23, 1984 and July 23, 1984. At the conclusion of the July session Jones again threatened to have an investigation and have Mayfield fired, presumably for mismanagement. Jones said nothing about sexual harassment.

32. Mayfield placed Jones in charge of the Dairy Program in early 1984, and sent Jones for training. When Jones had to make presentations explaining the program at DD conferences, Jones was unable to answer questions by DDs and depended on three of the DDs to assist him. Although the program required that producer contracts from the counties be sent to the STO during a 24 hour period, Mayfield had to put Worley in charge of coordinating delivery because Jones had made no arrangements. In addition, Jones did not respond to producer appeals of STC decisions in a timely and appropriate fashion.

33. We fully credit the oral and documentary evidence presented on behalf of defendant and accordingly find that plaintiff's job performance during the period 1972 to August 1984 was less than adequate, despite certain marginally "satisfactory" ratings.

### E. Jones' Personal Conflict With Mayfield

34. Probably as a direct result of losing out to Mayfield when the latter was appointed SED in 1981, Jones became openly critical of Mayfield. Early on he expressed to others his disapproval of certain management decisions as well as Mayfield's reluctance to delegate. Some agreed with his criticism of Mayfield's hands-on, detail-oriented style of management. These criticisms contributed to and helped to build up an atmosphere of divisiveness and discord.

35. Elaborating on the above, there were a number of incidents which contributed to disruption in the STO. One of these concerned the sexual harassment in Wheeler County of a female employee Kathleen Pritchard by Roy Jacoby, Chairman of the STC and Albert Hartman, County Executive Director. Jones complained that inadequate disciplinary action had been taken against Hartman, who was transferred to another county, 120 miles away, at reduced pay. No action was taken against Jacoby. Since Mayfield had been a long-time friend of Jacoby and Hartman, Jones claimed the matter had been covered up.

36. Another incident arose in July, 1984 when the STC held its monthly meeting in

Segovia, Texas at the River Valley Inn in which Jacoby held a 27% interest. This presented a potential conflict of interest which Mayfield discussed with Oberg, Cozart and Chris Reagan in Washington. Upon learning the rates for other meeting places were comparable, the place of the meeting at Segovia was approved.

37. The largest single contributing fact to the disruptive atmosphere of the STO concerned the apparent widespread rumors of sexual harassment of female employees by Mayfield and his apparent condonation of such conduct by others in the STO. Some of this information had been picked up by Jones' secretary, Anita Eickenhorst, and passed on to Jones.

38. The testimony at trial is undisputed that Mayfield had a widespread reputation at least since the early 1970's, as a "womanizer"; *i.e.*, one who frequently had sexual relations with women outside his marriage. Indeed, that reputation was sufficiently widespread that David McElwrath, a former SED himself, upon learning that Mayfield had been selected as SED in 1981, called one of Mayfield's close friends and asked him to talk to Mayfield and advise him to "clean up his act" before coming to College Station. Jones was also well aware of this reputation.

39. However, it was not until 1982 that Jones received information, mostly from his secretary, which implicated Mayfield with specific employees. One was Mary Lynn Galloway, who allegedly told Jones' secretary, that she had applied to be Mayfield's secretary and was advised by the latter that she would have to sleep with him and perhaps other members of the State Committee to get the job. Galloway allegedly refused. Two weeks later she resigned for a better paying job. Jones testified that Galloway had confirmed this incident to him.

Another was Joyce Weidner (who has since married and is now Joyce Graff), an ASCS employee in Houston. Lynn Elliott, a former CED, advised Jones that Weidner reported being sexually harassed by Roy Jacoby, who allegedly told Weidner that she would have to have sexual relations

with him to get a job as a CED trainee. She refused and shortly thereafter resigned from ASCS. According to Jones, Elliott also told him about another incident related to him by Weidner, in which Mayfield, during a business trip to Houston similarly without success "propositioned" Weidner and then gave her an agency-leased car to drive home. Elliott recalled only the incident regarding Jacoby.

Also in 1982 or 1983, Jones learned from his secretary that Mayfield allegedly made unwanted sexual advances to Gloria Lopez, a secretary at College Station, who later resigned from ASCS. Other allegations concerned the employment by Mayfield of Pat Gilstrap who became Mayfield's secretary, when his former secretary retired in May, 1982.

40. Without going into further detail concerning these incidents and without the necessity of deciding precisely what took place, we are satisfied that Mayfield's sexual advances, whether or not voluntarily participated in, were unwelcome to all or at least some of the female employees. We accordingly find that Mayfield's conduct and prior reputation as a "womanizer" and his failure to investigate the charges concerning Jacoby created an atmosphere of sexual harassment at the STO. Rumors concerning such together with criticism by Jones and some of STO employees concerning Mayfield's management style combined to cause discord, divisiveness and tension in the STO.

### F. Jones Seeks Mayfield's Removal

41. Beginning in 1982 Jones frequently complained to Cozart and Oberg and others about Mayfield's management style and his nondelegation of authority, but never mentioned sexual harassment until July, 1983 (to Chris Reagan, Assistant to Oberg).

42. In addition to his complaints to officials of ASCS, Jones sought relief on the political front. In the early summer of 1983, he went to see Charley Prine, a District Representative for then Congressman Gramm. Jones sought Mayfield's removal from office claiming that Mayfield was a poor administrator and that Jones should

have been made SED. Jones made no mention of sexual harassment, even though Prine pushed Jones for any kind of detail about what Mayfield was doing wrong.

In late summer 1983 Jones again visited Prine complaining that the STO was "going to hell in a handbasket." Prine again pushed Jones for specifics. Finally Jones mentioned that there were two women upset over "sex discrimination." Jones gave Prine two names and a phone number and asked him to call one of the two women. Prine called the phone number three times, each time leaving a message identifying himself as from Congressman Gramm's office. The woman never returned his calls.

Prine's impression was that Jones was angry he had been passed over for the SED job, but did not understand the process of removal. Prine also concluded Jones was not rational and it appeared to him that Jones was going to do whatever it took to make sure that Mayfield would be removed. Prine never contacted anyone at ASCS.

43. In the fall of 1983 Brad Smith, a seminary student and former Legislative Assistant to Senator Tower was told by Jones that Mayfield was incompetent and a bad manager. Jones' comments surprised Smith, because Secretary Block had told him that Mayfield was the best manager USDA had. It was not until February 1984 that Jones, in addition to claiming that Mayfield was incompetent, reported to Smith that three women had complaints against Mayfield for sexual harassment. Later Jones told Smith about the Wheeler County incident, which Jones said had been mishandled.

44. Jones repeated the same performance with John Weaver, a former senior field representative for Congressman Gramm, in late February or early March, 1984. Jones criticized the way Mayfield was handling his job and repeatedly stressed that while he had once been Mayfield's superior and was now under him, that "had nothing to do with" Jones' complaints about Mayfield. Jones asserted that Mayfield basically was a poor administrator and had allowed sexual harassment to go on underneath him; he gave Weaver a copy of the Pritchard statement concerning Jacoby and Hartman and told of a woman named Joyce who had been sexually harassed *but not by Mayfield.* Weaver's assessment was that Jones was bitter that a former subordinate was now his boss, and was attempting to make a political issue out of something that was not a political subject. After Weaver went to Austin to work on Gramm's campaign in July, 1984, Jones called his office once or twice a day for three or four weeks straight. Weaver never communicated Jones' allegations to anyone at ASCS.

45. Jones had been familiar with Mayfield's general reputation since 1972 and with the specific charges concerning the three women, as related to him primarily by his secretary, since 1982. His charges made in late 1983 and early 1984 to Prine, Smith and Weaver, the aides to the Texas Congressmen, Senator Tower and Representative Gramm, were predicated primarily on Jones' objections to Mayfield's incompetence as an administrator at the STO and the necessity for his removal. In July 1984, Jones called Chris Reagan, assistant to Oberg, about other matters including the Segovia matter and Matteson's conviction of DWI. He also mentioned sex harassment without giving names. We find that his charges of sexual harassment against Mayfield and condonation of the same by Mayfield were an afterthought and "make weight" to support his demands that Mayfield be removed. Jones' claims of outrage concerning Mayfield's sexual proclivities came very late and the genuineness of such claims is necessarily suspect.

46. The disruptive conditions in the STO continued unabated. On August 6, 1984 Mayfield and Jacoby met with Jones, and discussed his attitude, his complaints to Chris Reagan, his handling of the Internal Review program, his failure to keep the SED informed, and Jones' complaints to Brad Smith regarding the Wheeler County case. Mayfield transferred the Internal Review program to the ACP Division and responsibility for DD itineraries to the Administrative Division, leaving Jones with

the Dairy Program. There was no discussion of sexual harassment other than the Wheeler County matter. Jones again threatened to start an "investigation" and have Mayfield fired.

47. On August 8, 1984 Jones contacted the Office of the Inspector General (OIG). On August 10, he sent a complaint to the ASCS EEO Director, asserting that his duties were removed because he had "interceded" on behalf of subordinates, including DDs and others, and that the SED had been attempting to discredit him "for the past three years." He mentioned allegations of sexual harassment well down in the body of his complaint and concluded his EEO complaint by asserting that Mayfield should be removed. On August 15, Jones met with an EEO counselor and reiterated what was in the August 10 complaint.

48. At Oberg's suggestion, on August 15, Mayfield directed Jones to meet with the STC the next day in Austin. Austin was chosen because it was easier for STC members to fly there for a one day meeting than to switch planes and make commuter connections into College Station. Jones' response was noncommittal, and Mayfield contacted the STC and set up the meeting. When he checked back later with Jones, Jones said the request was unreasonable and he would not attend. Mayfield contacted the STC and moved the meeting to College Station. (See Findings 54–57).

49. After learning that plaintiff had met with an OIG investigator on August 8, 1984, ASCS officials on August 16, 1984 called for an investigation of Mayfield and Jacoby. OIG investigator Kim Widup spent several weeks in late August and September, 1984 in the College Station office and talked with virtually all of the employees. The investigation concerning Mayfield centered on the allegations that he had sexually harassed several female employees, and also included charges that he had authorized the use of a government-leased vehicle (to Ms. Weidner) for other than official purposes. The investigation concerning Jacoby likewise centered on the sexual harassment issue, as well as the potential conflict of interest arising out of

the holding of an agency meeting at the motel in Segovia which he and his family owned.

50. On October 18, 1984, a lengthy Report of Investigation concerning Mayfield was completed and sent by express mail to Washington for immediate delivery to ASCS officials. The Report contained sworn statements from four female employees that they had been sexually harassed by Mayfield and evidence which substantiated the other charges.

51. On December 18, 1984, USDA asked for a supplemental investigation, which was conducted in January, 1985 and led to a Supplemental Report of Investigation dated February 1, 1985.

52. On April 3, 1985, despite extensive lobbying efforts by the highest officials of ASCS, the USDA found that Mayfield had committed sexually harassing acts against four female employees, misused a government vehicle and transported alcohol in a government vehicle. Mayfield was suspended for thirty (30) days without pay. This decision made without a hearing was based on the OIG Report of Investigation.

G. *The Events Leading to Jones' Transfer to Washington*

53. In late July or early August, 1984, Al Oberg advised John Chott that Jones was going to receive an unsatisfactory performance rating. Chott testified that at about that time Mayfield was planning to give Jones a 1.5 rating.

54. On August 16, 1984 the STC and Mayfield met at the LaQuinta Motel, College Station, at 1:00 p.m. and then with Jones at 2:15 at the STO. At the first meeting the group discussed Jones' insubordination in refusing to meet in Austin, his allegations to Senator Tower's office regarding Wheeler County, his allegations regarding the Segovia meeting, his reporting an incident which concerned Matteson's DWI to Reagan, his poor attitude and rumormongering, and his inability to do his job.

55. By prearrangement, during the 1:00 meeting the STC and SED in College Sta-

tion had a conference call with Cozart, Oberg, Dovel, Milton Hertz (Acting DAS-CO) and Richard Ashworth (Executive Asst. to the Administrator) in Washington. They discussed Jones' insubordination, the fact that Jones was getting an unsatisfactory rating, and that Jones was calling for an investigation of misconduct by the SED/STC, specifically, the Wheeler County incident, the Segovia meeting, and a DWI conviction of Matteson. Dovel advised them to take no action concerning Jones' insubordination, because they had a documented case of poor performance. They agreed that ASCS would call for its own investigation of the "entire Texas Operation" and Jones' performance. There was no mention of allegations of sexual harassment by Mayfield or Jacoby, and Mayfield, Cozart and the others did not realize that OIG was investigating allegations of sexual harassment by Mayfield and Jacoby, as opposed to the Wheeler County matter, until the investigators spoke to Mayfield.

56. On the same day, August 16, 1984, the STC met with Jones. A shorthand transcript reflects that Jones complained about a host of subjects, but nowhere, either in the original draft transcript or in a copy that Jones later annotated, is there any mention of sexual harassment by Mayfield or Jacoby.

57. By the conclusion of the meeting with Jones it was obvious the STC could no longer work with him. He had made clear his intention to continue second-guessing every decision they made, chastised his superiors for not seeking *his* approval before they acted, and declared his intention to call for an investigation whenever he disagreed with them. The Committee members called the Area Office in Washington and told Oberg that Jones should be removed from the STO and it was agreed that upon conclusion of the investigation Jones would be separated for nonperformance.

58. On August 16, 1984 Mayfield sent copies of his documentation on Jones' performance to Oberg. Chott reviewed the documentation and advised Oberg that it supported a 1.5 rating; thereafter Oberg signed off on Jones' 1984 performance evaluation.

59. Employee morale in the STO rapidly deteriorated after the OIG investigation began. Jones continued to agitate and spread rumors about Mayfield. His work on the Dairy program required frequent correction. Relations between Mayfield and Jones became extremely strained. Fisher testified that Jones kept everything stirred up; when Jones disagreed with a decision the STC made regarding a particular county, it became a topic of conversation. Matteson stated that the STO was in shambles—anyone could make up a rumor and "run it by" Jones for publication. Matteson heard of rumors that the STC meeting in Houston in July 1982 had been a sex orgy (Matteson's wife and children had accompanied him) and that deceased STC member Margo was being linked to Gloria Lopez. Mayfield even learned that Jones was calling Mayfield's home county trying to ascertain program violations on the part of Mayfield's farming operation. The STO was divided into two hostile factions.

60. By November 1984 Fisher had reached the end of his patience and determined to resolve the Jones matter or to resign. Fisher contacted Oberg on November 7 about Jones and Oberg told him to put his complaint in writing. "Highly irritated," Fisher contacted Harold Thomas and Worth Matteson and said he was writing a letter to Oberg and that they could sign off on his letter or write their own. In his letter to Oberg, Fisher stated that Jones' remaining in the STO would continue to cause turmoil resulting in distrust and reduced efficiency. He highlighted Jones' lack of program knowledge and poor performance, his unwillingness to work with the STC and various other employees, and the paralysis resulting from the STC's fear that Jones would call for investigations of every decision they made. He added that the STC felt Mayfield had made every effort to work with Jones but to no avail. Thomas and Matteson wrote letters in a similar vein to Oberg.

61. When Oberg received these letters from the three committeemen, he brought

them to Cozart and Hertz. They decided to send someone from Personnel to Texas to investigate. Dovel and Chott selected Employee Relations Specialist Randy Mayes. Mayes was not assigned to the Southwest Area and had no prior involvement with the Texas STO; ASCS wanted an independent assessment. Mayes was given a copy of the Fisher letter and told to investigate Fisher's allegations.

62. On November 15, 1984 Mayes conducted interviews at the STO which form the basis of his report to Dovel. Some of the flavor of these interviews can be gained from the following examples. Fisher, Thomas and Matteson told Mayes that Jones could not perform his duties and was causing dissension among STO staff; they stressed the need for immediate action. Mayfield focused strictly on Jones' poor performance. Jones agreed that there was a morale problem in the STO but that the SED was responsible because Mayfield's actions had led to his (Jones) request for the OIG investigation. He further said that he could not work for Mayfield because he had no respect for him. Jones threatened "to go to the newspapers as a last resort" if Mayfield were not removed. Bowman stated that Jones lacked the necessary knowledge for his position and was hurting the morale of the whole office. Albert Marshall attributed the tense atmosphere at the STO to Mayfield's nondelegation of authority but reportedly had nothing to say about Jones. David McElwrath, who was called as a witness by Jones at the hearing in the present litigation, stated that he had similar problems with Jones' performance but found it possible "to work around him" and that morale would greatly improve if Jones were removed. Worley "blamed the turmoil on Jones' inability to do the job, the resentment this creates because of his (Jones') salary,* and the OIG investigation requested by Jones." Mayes' report concluded with the recommendation that Jones be removed through reassignment or by abolishing his position.

63. On November 16, 1984 Mayes returned to Washington and presented his findings to Cozart, Ashworth, Oberg, Chott and Dovel. At the meeting Mayes reviewed all of his findings and advised that Jones was not performing, morale was suffering and the situation was generally as bad as the committeemen had stated in their letters. Mayes recommended that Jones be removed from the STO. He also told them that Jones was threatening to go to the press if Mayfield were not removed. Mayes mentioned that Mayfield's failure to delegate was also a problem.

64. After Mayes concluded his presentation, Chott summarized the various options open to the ASCS management—detail, directed reassignment, abolishment of the Assistant to the SED/STC position, and removal based on performance—and discussed the pros and cons of each. Chott and Dovel apparently led the discussion, Chott being a Personnel Specialist and Dovel the Director of the Personnel Division. The group quickly ruled out the alternative of removal for poor performance and abolishment of the position. This was because removal for poor performance would take over four months to process due to grievance rights. Abolishing the position would give Jones "bumping rights" and justification for abolishing the position would be difficult given the very large size of the Texas ASCS operation. With respect to "reassignment," the options papers listed as an advantage that thirty days' notice was required. Under "detail" the memo stated as a plus that only two weeks' notice was needed. In fact, these notice requirements as stated were not completely accurate because USDA regulations permit a reassignment upon two weeks notice and a detail can be done overnight. The group was warned by Chott that because the action was being taken soon after OIG had issued its report on Mayfield, it might appear on its face to be reprisal against Jones.

65. On November 19 the same group met again, with the addition of DASCO Milton Hertz. Mayes and Chott repeated their presentations. At the conclusion of the meeting, Hertz made the decision to

---

* Jones receives a salary of $55,655.

detail Jones to Washington to a vacant Assistant to DASCO slot and then to permanently reassign him to Washington. He opted for the detail as the most appropriate alternative because it was the quickest way to move Jones out of the STO. Hertz knew nothing of Jones' family situation and had no thoughts regarding whether Jones would retire. He made the decision, without regard to Jones' allegations of sexual harassment or his EEO complaints, on the conviction that the STO could not function effectively if Jones remained, given Jones' inability to perform and the disruption he was generating. The next day Hertz called Jones and advised him that he was being detailed to Washington effective November 26, 1984.

66. On December 4, 1984 Hertz permanently reassigned Jones to Washington, effective January 7, 1985. The reasons for his reassignment were the same as for the original detail of November 26, 1984—Jones' unacceptable performance and the disruption he was causing in the STO. On December 18, Jones was granted leave to return to Texas until January 7.

67. The position of Assistant to DASCO to which Jones was transferred is not involved in the making of policy and consists of special projects. These projects can be tailored to fit the Assistant's particular abilities. Jones was assigned to do a major study in connection with the Agency's internal control program and Cozart testified that Jones did a satisfactory job. While it is clear that Jones was transferred *from* a position rather than *to* a position, his new position was already in existence. It was not created to accommodate the transfer and from all that appears in the record Jones is performing work which is necessary and meaningful.

68. Subsequent to his transfer Jones mobilized family and friends, and continued his efforts both on the political front as well as through conventional official channels. Brad Smith of Senator Tower's staff was deluged with phone calls and Jones even sought Smith's aid to speed up the Supplemental OIG investigation of Mayfield. At the same time Jones filed EEO charges challenging not only his transfer, but also the denial of forty hours sick leave to visit a doctor in Texas, the partial denial of temporary quarters reimbursement, and the letter of warning (sent after Jones repeatedly violated orders not to enter the STO while on leave, except to remove personal belongings).

69. Following Mayfield's 30 day suspension on April 3, 1985 as the result of the OIG investigation, the attack by Jones and his allies accelerated. Beginning in May, Jones' wife began an extensive letter writing campaign to politicians, USDA officials, members of the STC, and others. She enclosed copies of Mayfield's suspension letter, newspaper clippings, and even sent copies of the voluminous OIG reports to some. Most of these letters suggested that Mayfield be fired. When she learned (from reliable sources) that Mayfield had applied for a supergrade position in Washington, she wrote to Secretary Block threatening that the media would have a "field day" if Mayfield were selected.

70. Jones returned to Texas for ankle surgery in August, 1985. In September, he visited the OIG office and stated that the main problem with Mayfield was not sexual harassment or misuse of a vehicle but his mismanagement of the STO.

71. Based upon the totality of Jones' conduct—his continual complaints that Mayfield was mismanaging the office; his failure to mention allegations of sexual harassment for over a year after he learned of them from second hand sources, and the assessment of Prine, Weaver, and Smith that Jones was continually trying to bring political pressure to force Mayfield's removal—the conclusion is inescapable that the only reasons Jones even mentioned sexual harassment at all were because he resented Mayfield's appointment as SED, was aware Mayfield was dissatisfied with his performance, and would make every effort to dislodge Mayfield before he himself was fired. We find that Jones in a very real sense was a "loose cannon" whose protestations of moral outrage lack credibility. On the other hand, we in no way condone Mayfield's sexual conduct and

attitude toward female employees, as confirmed in the OIG report of April 3, 1985. These created a "hostile atmosphere" of sex harassment.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over this Title VII matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4).

2. Section 704(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a), prohibits an employer from retaliating against any employee because he has opposed an unlawful employment practice by an employer or because he has filed a complaint or participated in any way in a Title VII proceeding. Section 704(a) is applicable to federal employees through Section 717, 42 U.S.C. § 2000e–16. *Chandler v. Roudebush*, 425 U.S. 840, 841, 96 S.Ct. 1949, 1950, 48 L.Ed.2d 416 (1976).

■ 3. Sexual harassment of the type opposed by plaintiff includes "hostile environment" sexual harassment and is sexual discrimination prohibited by Title VII. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Henson v. City of Dundee*, 682 F.2d 897 (11th Cir.1982); *Bundy v. Jackson*, 641 F.2d 934 (D.C.Cir.1981).

■ 4. Plaintiff's acts and statements opposing sexual discrimination of female employees by ASCS officials including "hostile environment" sexual harassment are protected by the "opposition clause" of Section 704(a). The "opposition clause" protects opposition expressed in a wide variety of forms and is not limited to the filing of charges. *Armstrong v. Index Journal Co.*, 647 F.2d 441 (4th Cir.1981); *Novotny v. Great Amer Federal Savings & Loan Assoc.*, 584 F.2d 1235 (3d Cir.1978), *vacated on other grounds*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979); *Gresham v. Waffle House, Inc.*, 586 F.Supp. 1442, 1446 (N.D.Ga.1984).

5. The "opposition clause" protects statements by a person, such as plaintiff here, who is not himself the direct victim of the discriminatory practice but who opposes such discrimination against others.

*Spence v. Local 1250, UAW*, 595 F.Supp. 6, 10 (N.D. Ohio 1984); *Garcia v. Rush-Presbyterian-St. Luke's Medical Center*, 80 F.R.D. 254, 262 (N.D.Ill.1978); *Eichman v. Indiana State Univ. Board of Trustees*, 597 F.2d 1104 (7th Cir.1979).

■ 6. The familiar burdens of proof, persuasion and production which apply in Title VII cases generally, *see Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), also apply to retaliation litigation. *Williams v. Boorstin*, 663 F.2d 109 (D.C.Cir.1980); *Segar v. Civiletti*, 516 F.Supp. 314 (D.D.C.1981), *aff'd*, 738 F.2d 1249, 1295 (D.C.Cir.1984).

7. In order to establish a *prima facie* violation of Section 704(a), plaintiff must show "(1) that he protested practices contrary to Title VII; (2) that he was subject to an adverse action by his employer, and (3) that the adverse action is linked to the protected conduct." *Segar v. Civiletti*, 516 F.Supp. at 319; *Rogers v. McCall*, 488 F.Supp. at 697–98.

■ 8. Plaintiff has established a *prima facie* case. With respect to the first two elements, plaintiff, however belatedly, protested practices which were in violation of Title VII, *i.e.*, "hostile environment" sexual harassment. Moreover, the removal of most of his job responsibilities, his unsatisfactory performance rating, and his transfer to Washington were, in the circumstances of this case, adverse personnel actions. *See, e.g., Johnson v. Bergland*, 586 F.2d 993 (4th Cir.1978); *Gibson v. INS*, 541 F.Supp. 131, 134–35 (S.D.N.Y.1982); *Minor v. Califano*, 452 F.Supp. 36 (D.D.C.1978); *Jackson v. Bergland*, 448 F.Supp. 1146 (D.D.C.1978).

9. With respect to the third element, a *prima facie* case of retaliatory motive is proved by showing that plaintiff engaged in protected activities, that his employer was aware of the protected activities, and that the adverse action followed within a relatively short time thereafter. *Gonzalez v. Bolger*, 486 F.Supp. 595 (D.D.C.1980),

aff'd, 656 F.2d 899 (D.C.Cir.1981); *Brown v. Biglin,* 454 F.Supp. 394, 399 (E.D.Pa. 1978); *Hochstadt v. Worcester Foundation for Experimental Biology,* 425 F.Supp. 318, 324 (D.Mass.) *aff'd,* 545 F.2d 222 (1st Cir.1976).

■ 10. The plaintiff having established a *prima facie* case of discrimination, the burden shifted to defendant "to articulate some legitimate non-discriminatory reason" for the actions taken. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. at 252, 101 S.Ct. at 1093; *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802–05, 93 S.Ct. at 1824–25. The defendant has this burden of articulating legitimate reasons for the removal of Jones' duties, his unsatisfactory performance rating, and his transfer. The record clearly shows that Jones had a history of performance inadequacies over a long period and documented since the fall of 1983; that he frequently challenged major decisions of his superiors and was insubordinate, which prompted the three committeemen to write letters requesting Jones' removal; that he was disruptive and disloyal and preoccupied with seeking Mayfield's removal and that there was an irreconcilable personality clash between the two men. This split the STO into two hostile camps, which undermined the efficiency of STO operations. As a consequence, Randy Mayes made an independent recommendation that Jones be removed, which recommendation the ASCS officials had before them when the decision to transfer was made. All of these are legitimate reasons for the removal of Jones' duties, his unsatisfactory performance rating and transfer. *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 295, 58 L.Ed.2d 216 (1978).

■ 11. With respect to the ultimate issue, plaintiff has failed to prove by a preponderance of the evidence that the removal of his duties, his unsatisfactory rating, or his transfer to Washington were pretextual or in reprisal for exercising protected activity. The facts do not support Jones' claim of retaliation. Jones was relieved of his duties because he did not or could not perform them and he received an unsatisfactory performance rating because his performance was demonstrably unsatisfactory. The decision to transfer Jones was made by Washington officials confronted with an impossible situation in the STO which was adversely affecting the office's efficiency. Hertz did not order Jones' transfer because of Jones' activities in protesting sexual harassment by Mayfield and the latter's permissive sexual attitude. Rather, Hertz acted without regard to Jones' activities, even though he and the others were well aware that Jones might file charges of reprisal. Hertz simply could not allow the open warfare in the STO to continue. Jones' contributions to the work of the STO were minimal whereas Mayfield was an outstanding SED and ran a successful operation. Hertz' choice was clear.

■ 12. Plaintiff likewise failed to establish that defendant retaliated against him in the denial of a portion of his claim for temporary quarters reimbursement. Plaintiff presented virtually no evidence on this count of his complaint other than his testimony that he did not consider the home he was renting to be permanent. As of April, 1985 when plaintiff sought reimbursement, however, plaintiff had been living in Washington, D.C. for nearly five months and had been permanently reassigned to Washington since February, when the OSC declined any further stays of his transfer. Moreover, plaintiff introduced no evidence that his Dumfries, Virginia address has changed since that time, and as of January, 1986, he still had not decided whether to move his family from Texas. Plaintiff is not entitled to presume his quarters are temporary until his lawsuit is resolved.

13. Judgment shall be entered for defendant and this case shall be dismissed.

An order consistent with the foregoing Findings of Fact and Conclusions of Law is entered this day.